# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| K. JEFF CARNEY, M.D., PHARMD., ) | |
| ) | CIVIL ACTION FILE NUMBER: |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| EMORY UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

GARY BUNCH, P.C.

By: _____

Gary Bunch
Georgia Bar Number 094612
Attorney for Plaintiff K. Jeff Carney,
M.D., Pharm D.

208 Corporate Drive
Carrollton, Georgia 30117
(770) 836-0405

July 13, 2021

# **TABLE OF CONTENTS**

Jurisdiction and Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1.   Dr. Carney's is widely recognized as a brilliant urology
     reconstructive surgeon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.   Defendant's two types of faculty states: limited and continuous . . . . 6

3.   Defendant, nearly 20 years ago, entered into its only written
     employment contract with Dr. Carney. . . . . . . . . . . . . . . . . . . . . . 8

4.   Dr. Carney's continuous faculty status . . . . . . . . . . . . . . . . . . . . . 9

5.   Dr. Carney has de facto tenure . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

6.   Dr. Sanda's suspicious and baseless allegations, last September,
     against Dr. Carney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7.   Defendant's relentless and wrongful efforts to force Dr. Carney to
     undergo psychological counseling involving a
     medical examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8.   Defendant's demand for Dr. Carney to undergo psychological
     counseling, which would have involved a medical examination,
     violated the ADA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

9.   Defendant's planned wrongful termination of Dr. Carney in violation
     of the ADA because he rightfully refused the proposed
     psychological counseling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

10.  Defendant's blatant and inexcusable violations of Dr. Carney's due
     process rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

11.   The SOM's Dean treats the SOM's clinical faculty members as
      virtual non-entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

12.   The Dean's hands off approach to personnel decisions involving
      clinical faculty members has enabled Dr. Sanda to engage in a
      retaliatory personal vendetta against Dr. Carney . . . . . . . . . . . . . 40

13.   Defendant's decision-makes, above Dr. Sanda in Defendant's Chain
      of Command, have been derelict in their duty to protect Dr. Carney's
      rights by refusing to address the planned wrongful
      termination of Dr. Carney's employment . . . . . . . . . . . . . . . . . . . . . 42

14.   Defendant's violations of Dr. Carney's rights will cause Dr. Carney
      to suffer irreparable harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

15.   Defendant's termination of Dr. Carney's employment will have
      profound collateral consequences upon other persons causing
      them to suffer irreparable harm . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Count One: Dr. Carney's right, under the ADA, to injunctive relief . . . . . 50

Count Two: Dr. Carney's entitlement to injunctive relief because of his
            quasi-tenure rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## JURISDICTION AND VENUE

1.

The Court, pursuant to the Americans with Disabilities Act 41 U.S.C. 12101 et. seq. ("ADA"), has jurisdiction over the subject matter and the parties. Plaintiff, also, invokes this Court's jurisdiction under the Declaratory Judgment Act, 28 U.S.C. 2201, et. seq., as Plaintiff seeks declaratory and injunctive relief as such relief is necessary and desirable and in the interest of justice to provide Plaintiff a full and complete remedy for Defendant's indefensible violations of his rights. The Court, pursuant to 28 U.S.C. 1367, has supplemental jurisdiction over Plaintiff's pendent state law claims.

2.

Venue, pursuant to 28 U.S.C. 1391, is proper in this judicial district, because Defendant resides in this judicial district and its wrongful acts given rise to plaintiff's claims occurred in this judicial district.

-1-

## PARTIES

### 3.

Plaintiff K. Jeff Carney, M.D., PharmD. ("Dr. Carney") is a physician licensed to practice medicine by the State of Georgia and a pharmacist licensed to practice pharmacy by the State of Georgia.

### 4.

Defendant Emory University ("Defendant") is an institute of higher education with several professional schools including a School of Medicine ("SOM"). Defendant's registered agent for service of process is Amy Adelman located at Emory University, 201 Dowman Drive, 312 Administration Building, Atlanta, Georgia 30322.

## FACTS

### 1.

## DR. CARNEY IS WIDELY RECOGNIZED AS A
## BRILLIANT UROLOGY RECONSTRUCTIVE SURGEON

### 5.

Dr. Carney, for the past several years, has been the go-to surgeon in the Southeast for complex urology reconstructive surgeries.

- 2 -

6.

Defendant's 2015 personnel evaluation of Dr. Carney stated: "[Y]ou have established a reputation as a premier reconstructive urological surgeon in the Georgia-Alabama-South Carolina-Florida region."

7.

Martha Terris, M.D., a faculty member of Augusta University f/k/a Medical College of Georgia, has stated: "For years, Dr. Carney has been the first urologist most of the urology community in Georgia call when they encounter difficult reconstruction cases. . . over the years, Dr. Carney's reputation has extended beyond the borders of Georgia throughout the Southeast, the nation and even internationally." (Emphasis supplied.)

8.

Harry Clarke, M.D., a faculty member of the Medical College of South Carolina, has stated that Dr. Carney "is recognized as one of the top Reconstructive Urologists in the country, not only by myself and his peers but by the residents who seek out his fellowship program."

9.

Allen Morey, M.D., a faculty member of the University of Texas Medical College Southwest, has characterized Dr. Carney as being the "regional/referral surgeon for reconstructive urology in the Southeast US."

10.

The above accolades, about Dr. Carney's incredible surgical skills and unsurpassed reputation as a urology reconstructive surgeon, are illustrative and not exhaustive.

11.

Dr. Carney routinely performs successfully complex urology reconstructive surgeries that other SOM's clinical urology faculty members lack the ability to perform.

12.

Many of the SOM's clinical faculty members, in fact, are unwilling to attempt many of the complex urology reconstructive surgeries that Dr. Carney routinely performs successfully.

13.

Approximately 30% of Dr. Carney's surgical patients are Georgia residents residing outside the Atlanta Metropolitan area, who seek out Dr. Carney because of his phenomenal results in high risk surgeries.

14.

Approximately 20% of Dr. Carney's surgical patients are persons residing outside of the State of Georgia, who seek out Dr. Carney because of his phenomenal results in high risk surgeries.

15.

Dr. Carney's reconstructive urology surgery practice focuses on the most complex and challenging urological complications.

16.

Dr. Carney has developed a clinical program in reconstructive urology for the most complex injuries to the urinary system due to retrogenic. penetration or blunt trauma.

17.

Dr. Carney, who primarily performs high risk urological surgeries with little or no margin of error, has never had a medical malpractice claim against him.

18.

Dr. Carney, throughout his nearly 20 year career as a member of Defendant's SOM faculty, has received glowingly superlative personnel evaluations that reflect his unique and incredible reconstructive surgical talent and his many valuable contributions to the SOM.

19.

Defendant's personnel evaluations of Dr. Carney are attached as Exhibit "A."

**2.**

## DEFENDANT'S TWO TYPES
## OF FACULTY STATUS: LIMITED AND CONTINUOUS

20.

Defendant has two status of faculty members: limited status and continuous status.

21.

Defendant's Statement of Policy's provides that limited faculty status is terminated at the close of a period of time specified in writing for the appointee. (See Exhibit "B.")

22.

A limited faculty status member, if the faculty member is to continue after the close of the period of time for his or her faculty appointment, has to be renewed. (See Exhibit "B.")

23.

A faculty appointment, from its inception, can be a continuous appointment.

24.

A limited faculty appointment can evolve into continuous faculty status.

25.

A non-tenured faculty member can have continuous faculty status.

26.

A continuous faculty status, whether from inception or as a result of evolving over time, cannot to be terminated except for adequate cause, or by retirement in accordance with the procedures of Defendant's Retirement Plan. (See Exhibit "B.")

27.

Continuous faculty status does not have to be renewed.

28.

Continuous faculty status continues until the faculty member retires, resigns or is terminated for cause. (See Exhibit "B.")

29.

Continuous status faculty member may be terminated for only the following

limited reasons:

> moral delinquency, neglect of academic duty,
> incompetence, permanent physical or mental incapacity
> for which there is no reasonable accommodation, or
> other such adequate cause.

(See Exhibit "B.")

## 3.

## DEFENDANT, NEARLY 20 YEARS AGO, ENTERED INTO ITS ONLY WRITTEN EMPLOYMENT CONTRACT WITH DR. CARNEY

30.

Dr. Carney, nearly 20 years ago, August 16, 2001, became a member of the

SOM faculty.

31.

Defendant drafted Dr. Carney's August 16, 2001 faculty appointment

contract.

32.

Any ambiguity, in Dr. Carney's written contract with Defendant, is resolved

against Defendant as the document's drafter.

33.

Defendant, in direct violation of its policy that a limited faculty status be for a specific period of time, in its written contract with Dr. Carney failed to specify a period of time for Dr. Carney's limited faulty appointment status.

34.

A copy of Dr. Carney's August 16, 2001 written contract appointing him to the SOM's faculty is attached as Exhibit "C."

35.

Defendant's contract with Dr. Carney explicitly stated: "University guidelines requiring that these [limited status] faculty be given appropriate notice if the appointment is not to be renewed in the subsequent year."

**4.**

**DR. CARNEY'S CONTINOUS FACULTY STATUS**

36.

Dr. Carney, for 20 years next month, continuously has been a member of the SOM's faculty.

37.

Dr. Carney's August 16, 2001 contract with Defendant, although potentially renewable annually, did not automatically renew.

38.

Defendant, for the past several years, until May 26, 2021, has treated Dr. Carney's faculty status as if he has continuous faculty status.

39.

Defendant has never presented another faculty appointment contract to Dr. Carney.

40.

Defendant has never asked Dr. Carney to go through the faculty appointment renewal process or to renew his faculty appointment.

41.

Defendant has never discussed the renewal of Dr. Carney's faculty appointment with him.

42.

Defendant, by its agents' words and actions, has represented to Dr. Carney that he has continuous faculty status.

43.

Defendant's 2014 personnel evaluation of Dr. Carney, stated that "[Dr. Carney] is the cornerstone of Emory Urology present and future." (Emphasis supplied.)

- 10 -

44.

Defendant's description of Dr. Carney, as being the Urology Department's "cornerstone in the present and future," is consistent only with Dr. Carney having continuous faculty status.

45.

Defendant's description of Dr. Carney as being the Urology Department's "cornerstone in the present and future" is inconsistent with Defendant's current position that Dr. Carney only has limited faculty status.

46.

The SOM's leadership, in many conversations and meetings with Dr. Carney, throughout the last several years, has made statements about the SOM's future events and programs, that made sense only if Dr. Carney has continuous faculty status.

47.

Defendant's 2015 personnel evaluation of Dr. Carney, in pertinent part, states: "In the coming years, the Urology Department would benefit from your continued leadership as the GME site Director for the Grady location, your leadership of the Emory GURS Fellowship, and your continued participation in mentoring of medical students, residents and junior faculty alike." (Emphasis supplied.)

- 11 -

48.

Defendant's 2019 personnel evaluation of Dr. Carney stated: "<u>In the coming years</u>, Emory SOM the Department would benefit from <u>your continued leadership</u> and contribution to these existing internal services." (Emphasis supplied.)

49.

Defendant's repeated references, in its personnel evaluations of Dr. Carney, to the "coming years" and "continued leadership" are consistent with Dr. Carney having continuous faculty status.

50.

Defendant's repeated reference, in its personnel evaluations of Dr. Carney, to the "coming years" and "continued leadership" are inconsistent with Defendant's current position that Dr. Carney has limited faculty status.

51.

Defendant, for the past several years, has given long term assignments to Dr. Carney consistent with his continuous faculty status.

52.

Defendant, ten years ago, asked Dr. Carney to start a Urology Fellowship program for reconstructive urology surgery, a time consuming task requiring substantial time and energy over many years.

53.

It takes a Fellowship Program many years to build a national reputation that attracts top Fellowship talent.

54.

Dr. Carney, during the past ten years, has developed a top ranked Fellowship Program for reconstructive urology surgery.

55.

Six of the Fellows in Defendant's Urology Fellowship Program, for whom Dr. Carney has acted as mentor, have been appointed to the faculties of leading American Medical Schools.

56.

Defendant, during 2020, had Dr. Carney participate in the Genitourinary Reconstructive Surgery Fellowship match program for Fellows.

57.

Defendant, during 2020, entered into a contract with Natalie Swavely, M.D. for her to be a Fellow with Defendant's Urology Fellowship Program, under Dr. Carney's direction, for a year August 1, 2021 through July 31, 2022.

58.

Defendant staffs Urology departments at five major Atlanta Metropolitan area hospitals.

59.

Defendant's Urology Fellowship Program, because of the extensive time and effort required to be devoted to the Fellowship Program, is based primarily at Grady Memorial Hospital ("Grady") under Dr. Carney's direction.

60.

Fellows in Defendant's Urology Fellowship Program spend approximately 80-85 percent of their time at Grady and the remaining 15-20 percent of their time at Emory University Hospital.

61.

Defendant, in addition to having Dr. Carney develop a top ranked Urology Fellowship Program, assigned Dr. Carney to be the Chief of Services for Grady's Urology Department, where many of the SOM's medical resident train.

62.

Dr. Carney, for the past nearly 20 years until July 1, 2021, until Defendant wrongfully terminated him as the Chief of Services for Grady's Urology Department.

63.

Grady's Chief of Urology Services' responsibilities include (1) providing

and ensuring that the SOM's Urology residents based at Grady receive proper

training; (2) supervising patient care and treatment; and (3) developing new

clinics.

64.

In the recommendation for Dr. Carney's promotion to Associate Professor,

it was noted that "Dr. Carney has led [the Grady] Urology services to become one

of the most prominent gems in Grady's crown."

65.

Dr. Carney's nearly 20 years, as being the Chief of Grady's Urology

Services, is consistent with him having continuous faculty status.

66.

Dr. Carney's nearly 20 year longevity as a member of the SOM's faculty,

coupled with Defendant's assignments and representations to him and Defendant's

adoption of the AAUP's policy governing the rights of long term faculty members,

reasonably led Dr. Carney to believe that he has had continuous faculty status for

the past several years.

67.

Dr. Carney's reasonable belief that he has continuous status was material to many of Dr. Carney's career decisions, such as not seeking or accepting faculty positions at other medical schools, devoting substantial time and energy, while not receiving additional compensation, for being the Director of the SOM's Urology Fellowship Program and being Grady's Chief of Urology Services.

68.

Dr. Carney, because of the SOM treating him as if he had continuous faculty status, reasonably believed that, as long as he satisfactorily performed his duties, which he has done, he would continue to be a member of the SOM's faculty.

**5.**

**DR. CARNEY HAS DE FACTO TENURE**

69.

A faculty member, after seven years of continuous service as a faculty member, according to the governing policy American Association of University Professors ("AAUP"), should be treated as having de facto tenure.

70.

Defendant's Board of Trustees ("Board"), long ago in Defendant's Statement of Principles Governing Faculty Relations, accepted the AAUP's general principles and purposes regarding faculty member's substantive and procedural rights. (See Exhibit "B.")

71.

Defendant's Statement of Principles Governing Faculty Relationship, in

connection with incorporating the AAUP's governing policy regarding long term

faculty members, in pertinent part, states:

> A concern to provide a University atmosphere in which there is freedom to pursue truth and to discuss all relevant questions <u>has led the trustees of Emory University to accept the general principles and purposes embodied in the 1940 Statement of Principles</u> on Academic Freedom and Tenure that was originally cosponsored by . . . the American Association of University Professors and subsequently endorsed by more than a score of major educational associations and learned societies.
> The 1940 Statement emphasizes that to ensure maximum effectiveness; faculty members should have security adequate for freedom to teach and to seek truth. <u>This includes security of position after a reasonable period of probation</u> . . . and assurance of explicit contract.

> ### XXX

> <u>With the acceptance by trustees, administrative officers, and faculty members of the related principles of freedom and obligation, an individual faculty member is assured of reasonable protection against arbitrary pressures and procedures</u> . . . .

(See Exhibit "B.") (Emphasis supplied.)

72.

Thomas D. Rogers, PhD.,  President of Defendant's AAUP Chapter,

recently wrote a letter to the SOM's Dean protesting Defendant's egregious

violations of Dr. Carney's rights as a long term faculty member.

73.

Dr. Rogers' letter protesting Defendant's violations of Dr. Carney's rights

as a continuous faculty member, in pertinent part, states:

> Those who are reappointed beyond seven years should
> be recognized as having the protections that would
> accrue with tenure - termination only for adequate case
> and with due process.
>
> Dr. Carney appears to have long since attained the
> protections of tenure through the length of his service.
> Regarding due process, the 1940 Statements state:
> '[t]ermination for cause of a continuous appointment, or
> the dismissal for cause of a teacher previous to the
> expiration of a term appointment, should, if possible, be
> considered by both a faculty committee and the
> governing board of the institution.'
>
> The AAUP's Statement on Government of Colleges and
> Universities asserts straightforwardly that "faculty status
> and related matters are primarily a faculty responsibility;
> this area includes appointments, reappointments,
> decisions not to reappoint, promotions, the granting of
> tenure, and dismissal."
>
> This means that faculty must play a role in the weightiest
> decisions of university life, including contact renewals.

(Emphasis supplied.)

74.

Dr. Rogers' letter to the SOM's Dean protesting Defendant's violations of

Dr. Carney's rights as a continuous faculty member is attached as Exhibit "D."

75.

The SOM's Dean has failed to respond to Dr. Rogers' letter.

76.

Anita Levy, PhD., the National AAUP's Associate Secretary, recently wrote

a letter to Defendant's President Gregory L. Fenves protesting Defendant's

violations of Dr. Carney's rights as a long term faculty member.

77.

Dr. Levy's letter to Defendant's President protesting Defendant's egregious

violations of Dr. Carney's rights as a long term faculty member, in pertinent part,

states:

> The general academic community recognizes that the
> dismissal for cause of a faculty member on continuous
> appointment, or with a special or probationary
> appointment before the end of a specified term should
> occur only after the affordance of requisite safeguards of
> academic due process. The following specific procedures
> are among those set forth in Regulation 5 of the
> Recommended Institutional Regulations: 'a statement of
> charges, framed with reasonable particularity by the
> president or the president's delegate'; a formal hearing of
> record on the charges, conducted by an elected faculty

22

> body; the faculty member's right to have legal counsel;
> the faculty member's right to have evidence introduced
> at the hearing and placed in the record; the
> administration's bearing the burden of demonstrating
> adequate cause for dismissal through clear and
> convincing evidence in the record considered as a whole;
> opportunity for the affected faculty member to cross-
> examine witnesses.

(Emphasis supplied.)

78.

Dr. Levy's letter to Defendant's President protesting Defendant's violations

of Dr. Carney's rights as a continuous faculty member is attached as Exhibit "E."

79.

Defendant's President has failed to acknowledge much less respond to Dr.

Levy's letter.

80.

The United States Supreme Court in Perry v. Sinderman, 408 U.S. 593

(1972), recognized the de facto tenure principle.

81.

The Supreme Court, in Perry, stated:

> A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a property interest in re-employment.

Id. at 601. (Emphasis supplied.)

82.

The Supreme Court, in Perry, stressed:

> A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service and from other relevant facts that he has a legitimate claim of entitlement to job tenure.

Id. at 602. (Emphasis supplied.)

83.

The Supreme Court, in Perry, in concluding its de facto tenure analysis, stated:

> We disagree with the Court of Appeals insofar as it held that a mere subjective expectancy is protected by procedural due process, but we agree that the respondent must be given an opportunity to prove the legitimacy of his claim for such entitlement in light of the policies and

practices of the institution. Proof of such a property
interest would not, of course, entitle him to
reinstatement. But such proof would obligate college
officials to grant a hearing at his request, where he could
be informed of the grounds for his nonretention and
challenge their sufficiency.

Id. at 603. (Emphasis supplied.)

84.

Dr. Carney, because of all of the facts set forth above, has de facto tenure.

## 6.

## DR. SANDA'S SUSPICIOUS AND BASELESS ALLEGATIONS, LAST SEPTEMBER, AGAINST DR. CARNEY

85.

Dr. Sanda, during September 2020, presented five baseless alleged complaints against Dr. Carney.

86.

A serious question exists if Dr. Sanda, as part of his irrational personal vendetta against Dr. Carney, fabricated the alleged complaints that he presented against Dr. Carney.

87.

Dr. Carney has never seen a document containing the alleged allegations against him, which Dr. Sanda referenced in his September 2020 communication.

88.

During Dr. Carney's nearly 20 year career at Defendant's SOM, there has never been similar allegations against Dr. Carney.

89.

The timing of Dr. Sanda's allegations against Dr. Carney, last September, is very suspicious.

90.

Dr. Sanda suspiciously, only three weeks after Dr. Carney forcefully and firmly responded to Dr. Sanda's fallacious statements in his 2020 personnel evaluation of Dr. Carney, made the statement about the alleged allegations against Dr. Carney, without any underlying documentary support.

91.

When the alleged complaints against Dr. Carney mentioned by Dr. Sanda last September were investigated by Defendant's Title IX Department, no one made a complaint against Dr. Carney.

92.

If the alleged complaints against Dr. Carney mentioned by Dr. Sanda last September were real and not fabricated by Dr. Sanda, one would assume reasonably that at least one complainant would have responded to the inquiries by Emory Title IX Department.

93.

Two of the alleged complaints against Dr. Carney were so baseless on their face that Dr. Sanda, if he had been acting in good faith, would not have brought them to the attention of Dr. Carney or anyone else.

94.

The alleged complaints against Dr. Carney, last September, quickly were found by Defendant's Title IX Department to be without merit and were not pursued.

**7.**

**DEFENDANT'S RELENTLESS AND WRONGFUL EFFORTS TO FORCE
DR. CARNEY TO UNDERGO PSYCHOLOGICAL COUNSELING
INVOLVING A MEDICAL EXAMINATION**

95.

Dr. Sanda acknowledged that the alleged complaints last September against

Dr. Carney, even if true which they were not, did not warrant any disciplinary

action.

96.

Dr. Sanda, on Defendant's behalf, inexplicably and abusively used the

baseless alleged complaints against Dr. Carney to demand on Defendant's behalf

that Dr. Carney obtain psychological counseling from a psychologist on

Defendant's staff, Gordon Tuttle, PhD. ("Dr. Tuttle").

97.

Defendant, thereafter, through the wrongful and abusive actions of its agent

Dr. Sanda, engaged in a relentless campaign, in violation of the ADA, to force Dr.

Carney to undergo a medical examination through psychological counseling.

98.

Defendant's demand that Dr. Carney receive psychological counseling, which would include a medical examination violated Dr. Carney's rights under the ADA.

99.

The wrongfully demanded psychological counseling, by Defendant, involved, as defined by the ADA, a medical examination.

100.

Dr. Sanda, in his written communications demanding Dr. Carney receive psychological counseling from Dr. Tuttle, equivocated about the scope and nature of the demanded psychological counseling with Dr. Tuttle.

101.

Dr. Sanda, in his written communications, coyly and disingeniunely attempted to conceal the scope of his demand for Dr. Carney to receive psychological counseling with Dr. Tuttle.

102.

Dr. Sanda, however, in his numerous personal communications with Dr. Carney, made it perfectly clear to Dr. Carney that the demanded psychological counseling with Dr. Tuttle included a medical examination.

103.

Dr. Sanda, in his personal communications with Dr. Carney, without a scintilla of evidence, suggested that Dr. Carney had a mental disability, which needed to be "nipped in the bud."

104.

Dr. Sanda repeatedly berated Dr. Carney as needing to address his mental issues.

105.

Dr. Sanda's malicious and preposterous statements to Dr. Carney about him having an allegedly unspecified mental disability were as demeaning and insulting as they were baseless.

106.

Dr. Sanda had the audacity to tell Dr. Carney that his refusal to receive psychological counseling from Dr. Tuttle reflected Dr. Carney's denial of his disability requiring psychological counseling.

107.

Dr. Sanda's intention for the demanded psychological counseling to include a medical examination is further reflected by Dr. Sanda's inflexible demands.

108.

When Dr. Carney attended and successfully completed Duke University Fuqua Business School's leadership program, Dr. Sanda remained adamant that Dr. Carney receive psychological counseling.

109.

When Dr. Carney met with the SOM's Associate Dean and another faculty member several times to discuss interpersonal skills, Dr. Sanda remained adamant that Dr. Carney receive psychological counseling.

110.

Dr. Sanda, in his communications with Dr. Carney, stated that Dr. Carney's efforts with regard to leadership and interpersonal skills did not eliminate the need for Dr. Carney to receive psychological counseling.

111.

Nothing that Dr. Carney did, or could do, would satisfy Dr. Sanda, except for Dr. Carney receiving psychological counseling that included a medical examination.

112.

Dr. Carney did everything that Dr. Sanda requested, except for Dr. Sanda's demand, in violation of the ADA, for Dr. Carney to receive psychological counseling that would involve a medical examination.

**8.**

**DEFENDANT'S DEMAND FOR DR. CARNEY TO UNDERGO PSYCHOLOGICAL COUNSELING, WHICH WOULD HAVE INVOLVED A MEDICAL EXAMINATION, VIOLATED THE ADA**

113.

Defendant's demand for Dr. Carney to undergo psychological counseling, which would have involved a medical examination, violated the ADA.

114.

Defendant's personnel evaluations of Dr. Carney conclusively establish that the demanded psychological counseling was not job related.

115.

Defendant's personnel evaluations of Dr. Carney conclusively establish that the demanded psychological counseling was not consistent with Defendant's business necessity.

116.

Defendant's personnel evaluations of Dr. Carney conclusively establish that Defendant's demand for psychological counseling was abusive.

117.

Defendant's personnel evaluations of Dr. Carney conclusively establish that Defendant's demand for psychological counseling was made in the utmost bad faith.

118.

Dr. Carney refusal of Defendant's wrongful and bad faith demand, in violation of the ADA that he receive psychological counseling involving a medical examination, was reasonable.

119.

Dr. Carney had the absolute right to refuse to submit to a medical examination, through psychological counseling, that was neither job related nor consistent with Defendant's business necessity.

**9.**

## DEFENDANT'S PLANNED WRONGFUL TERMINATION OF DR. CARNEY IN VIOLATION OF THE ADA BECAUSE HE RIGHTFULLY REFUSED THE PROPOSED PSYCHOLOGICAL COUNSELING

120.

Because Dr. Carney rightfully continued to refuse to receive psychological counseling from Dr. Tuttle, which based upon Dr. Sanda's statements and actions would have involved a medical examination in violation of the ADA, Defendant has stated its intention to terminate Dr. Carney's employment August 31, 2021.

121.

Defendant, May 26, 2021, advised Dr. Carney that his faculty appointment expires August 31, 2021 and will not be renewed.

122.

Defendant's self-serving statement that Dr. Carney's faulty appointment expires August 31, 2021 is utterly false.

123.

Defendant knows that its statement, about Dr. Carney's faculty appointment expiring August 31, 2021, is false.

124.

Defendant has presented only one faculty appointment contract to Dr. Carney.

125.

Defendant's only faculty appointment contract with Dr. Carney was nearly 20 years ago, August 16, 2001.

126.

Dr. Carney's original August 16, 2001 faculty appointment, because of Dr. Carney's longevity as a faculty member and Defendant's actions and representations, several years ago converted into Dr. Carney having continuous faculty status.

127.

Defendant knows that Dr. Carney's 2001 faculty appointment years ago was converted into continuous faculty status.

128.

A continuous faculty member's appointment does not expire.

129.

A faculty member, with continuous faculty status, does not go through the reappointment process.

130.

Contrary to Defendant's blatant and outrageous misrepresentation, Defendant is terminating Dr. Carney's continuous faculty status in violation of the ADA, because of his rightful refusal to receive psychological counseling from Dr. Tuttle.

**10.**

**DEFENDANT'S BLATANT AND INEXCUSABLE VIOLATIONS OF DR. CARNEY'S DUE PROCESS RIGHTS**

131.

Dr. Carney, by his continuous faculty status, has fundamental due process rights with regard to any adverse  actions to be taken by Defendant.  (See Exhibits "B," "D" and "E.")

132.

Defendant, in connection with terminating Dr. Carney in violation of Dr. Carney's continuous faculty status, has failed to provide any due process to Dr. Carney.

133.

Due process ensures that the actions taken with regard to a faculty member are for just cause.

134.

Due process is designed to protect faculty members from employment decisions, such as the situation here, made out of malice, vindictiveness, intolerance, prejudice, jealousy or retaliation.

135.

Due process facilitates better and more just decision-making made by independent factfinders based on real evidence that can be tested by the faculty member whose conduct is at issue.

136.

Due process protects a faculty member from an unscrutinized decision by a single superior, such as here by Dr. Sanda, with suspect motives arising from a personal grudge.

137.

Defendant has failed and refused to provide Dr. Carney a single due process right to which he is entitled.

138.

Defendant's violation of any of Dr. Carney's due process rights, stated in paragraph 76, entitle Dr. Carney to his requested relief.

139.

Defendant's cumulative violations of Dr. Carney's due process rights, set forth in paragraph 76, make a mockery of Dr. Carney's de facto tenure status.

140.

Defendant's cumulative violations of Dr. Carney's due process rights show Defendant's utter bad faith in connection with its wrongful plan to terminate Dr. Carney's employment.

## 11.

## THE SOM'S DEAN TREATS CLINICAL FACULTY MEMBERS AS VIRTUAL NON-ENTITIES

141.

The SOM's Dean shows zero interest in patient care and treatment.

142.

The SOM's Dean shows zero interest in whether patients receiving care and treatment by the SOM's clinical faculty members are satisfied with the care and treatment proved by the SOM's clinical faculty members.

143.

The SOM's Dean views any time spent involving a SOM's clinical faculty member as totally wasted time.

144.

The SOM's Dean, despite Dr. Carney being the SOM's super star reconstructive urology surgeon, has never met or spoken with Dr. Carney.

145.

The SOM's Dean, despite Dr. Carney developing a nationally top ranked Fellowship Program, has never met or spoken with Dr. Carney.

146.

The SOM's Dean, despite Dr. Carney for several years being the Chief of the Urology Services at Grady, has never met or spoken with Dr. Carney.

147.

The SOM's Dean, to Dr. Carney's knowledge, has never been to Grady to observe Defendant's Urology Fellowship Program based primarily at Grady.

148.

The SOM's Dean, to Dr. Carney's knowledge, has never been to Grady to observe the patient care and treated provided by the Urology Department's clinical staff and residents at Grady.

**12.**

**THE DEAN'S HANDS OFF APPROACH, TO PERSONNEL DECISIONS INVOLVING CLINICAL FACULTY MEMBERS, HAS ENABLED DR. SANDA TO ENGAGE IN A RETALIATORY PERSONAL <u>VENDETTA AGAINST DR. CARNEY</u>**

149.

The SOM's Dean does not become involved in personnel decisions involving the SOM's clinical faculty members.

150.

The SOM's Dean perfunctory, without any independent analysis or factual review, signs off on Department Chairs' personnel decisions involving clinical faculty members.

151.

The SOM's Dean, without considering the impact that personnel decisions will have upon the SOM's clinical faculty and the clinical faculty's patients, blindly signs off on Department Chairs' personnel decisions.

152.

The SOM's Dean delegates total control over personnel decisions involving clinical faculty members to Department Chairs.

153.

The policy of the SOM's Dean's to delegate complete authority of personnel decisions to the Department Chairs is imprudent and irresponsible.

154.

Dr. Sanda, because of the SOM's Dean's well-known total hands off policy with regard to personnel matters, is able to engage in his personal vendetta against Dr. Carney with impunity.

155.

Dr. Sanda has engaged in many irrational and abusive actions against Dr. Carney that can be explained only as arising from an irrational personal vendetta.

156.

Dr. Carney, because of Dr. Sanda's edict, is the only Urology Department clinical faculty member, who does not have the assistance of a resident.

157.

Dr. Sanda, to spite Dr. Carney and to the great injury to the SOM, has refused to have the SOM participate in the GURS Fellowship Match Program for 2022.

**13.**

**DEFENDANT'S DECISION-MAKERS, ABOVE DR. SANDA
IN DEFENDANT'S CHAIN OF COMMAND, HAVE BEEN DERELICT IN
THEIR DUTY TO PROTECT DR. CARNEY'S RIGHTS BY
REFUSING TO ADDRESS THE PLANNED WRONGFUL
<u>TERMINATION OF DR. CARNEY'S EMPLOYMENT</u>**

158.

Defendant's decision-makers, in addition to failing to provide due process

to Dr. Carney with regard to Defendant's planned termination of his employment,

have refused to meet with Dr. Carney to address its wrongful termination of his

employment.

159.

Defendant's decision-makers, in addition to its blatant violation of Dr.

Carney's due process rights, refuse and fail to treat Dr. Carney with the basic

human decency, dignity and respect that a 20 year faculty member deserves.

160.

The SOM's Dean refuses to acknowledge much less respond to Dr.

Carney's appeal of Defendant's arbitrary and capricious decision to terminate him

as a member of the SOM's faculty.

161.

The Urology Department's clinical faculty members' personnel evaluations of Dr. Sanda, as the Chair of the SOM's Urology Department, make it abundantly clear that he lacks minimal leadership skills.

162.

The Urology Department's clinical faculty members' personnel evaluations of Dr. Sanda, as the Chair of the SOM's Urology Department, show that many of the SOM's Urology Department faculty members view Dr. Sanda's heavy handed leadership with utter disdain.

163.

Dr. Sanda's Machiavellian tactics, in connection with running the Urology Department, not only violate the faculty members' rights but, also, place patient health and safety at risk.

164.

The SOM's Dean cavalierly ignores the horrible evaluations of Dr. Sanda by the Urology Department's clinical faculty.

165.

Defendant's Board has refused to respond to Dr. Carney's appeal of Defendant's planned termination of his employment.

166.

Defendant's Board, if it had performed a minimal investigation, would have learned that any problem associated with the Urology Department does not arise from Dr. Carney.

167.

A minimal investigation by Defendant's Board would have led to the inescapable conclusion that Dr. Sanda's demand for Dr. Carney to have psychological counseling and plan to terminate Dr. Carney's employment August 31, 2021, arise from Dr. Sanda's irrational personal vendetta against Dr. Carney.

168.

A minimal investigation by Defendant's Board would have established, beyond a shadow of a doubt, that there is not legitimate reason to terminate Dr. Carney's employment.

169.

A minimal investigation by Defendant's Board would have established that Defendant is trampling over Dr. Carney's due process rights.

170.

The Board has been derelict in its duty by failing to (1) protect Dr. Carney's right to have his employment terminated for only legitimate reasons as set forth in paragraph 29; (2) protect Dr. Carney's due process rights; and (3) protect the integrity of Defendant's personnel decision-making process.

171.

The Board's dereliction of duty is unfathomable as will as unreasonable and unacceptable.

172.

Defendant's Office of the President has refused to respond to Dr. Carney's appeal of Defendant's planned termination of his employment.

173.

No legitimate excuse or justification exists for the refusal by Defendant's Chain of Command to address Defendant's stated intent to terminate Dr. Carney's employment effective August 31, 2021.

**14.**

## DEFENDANT'S VIOLATION OF DR. CARNEY'S RIGHTS WILL CAUSE DR. CARNEY IRREPARABLE HARM

174.

Defendant's violations of Dr. Carney's rights, under the ADA and his quasi-tenure rights, will cause Dr. Carney to suffer irreparable harm for which he has no adequate remedy of law.

175.

Dr. Carney, if his being a member of the SOM's faculty ends August 31, 2021, will be forced to sell his home because of financial considerations.

176.

Each piece of property, such as Dr. Carney's home, is unique.

177.

The loss of an unique piece of property, such as Dr. Carney's home, constitutes irreparable harm.

178.

Dr. Carney, if his faculty member status ends August 31, 2021, will have to move away from the Atlanta Metropolitan area, which will impair substantially his ability to continue his weekly visits with his elderly Mother, who resides in a Rome, Georgia assisted living facility.

179.

Dr. Carney's Father is deceased and his only sibling (his mother's only other child) lives in San Francisco, California.

180.

Dr. Carney's weekly visits with his elderly Mother who is unable to travel, is of critical importance not only to him but, also, to her.

181.

The substantial impairment of Dr. Carney's ability to visit his elderly Mother weekly, during the last years of her life, will cause Dr. Carney irreparable harm.

182.

No amount of money can compensate Dr. Carney adequately for being deprived of time with his Mother during the last years of her life, particularly when his visits with her are so important to her.

**15.**

**DEFENDANT'S TERMINATION OF DR. CARNEY'S EMPLOYMENT WILL HAVE PROFOUND COLLATERAL CONSEQUENCES UPON OTHER PERSONS CAUSING THEM TO SUFFER IRREPARABLE HARM**

183.

Defendant's planned termination of Dr. Carney's employment as a faculty member will cause Dr. Carney simultaneously to lose his privileges to practice medicine at Grady.

184.

Dr. Carney has many long term Grady patients with severe urology medical issues.

185.

Dr. Carney is the only member of the SOM's faculty capable of dealing with many of his Grady patients' severe urology issues that require reconstructive surgery.

186.

Defendant's planned replacement for Dr. Carney is not a reconstructive surgeon.

187.

Many of Dr. Carney's Atlanta based indigent minority patients at Grady, because of their limited financial resources, will be unable to follow Dr. Carney to another hospital if he is forced, because of Defendant's wrongful and retaliatory termination of his employment, to move away from the Atlanta Metropolitan area.

188.

Dr. Carney, if Defendant goes forward with its plan to terminate his employment, will lose his privileges to practice at Grady, because of Defendant's staffing agreement with Grady.

189.

Dr. Carney, if Defendant goes forward with its plan to terminate his employment, will lose the ability to treat his long standing Grady patients at other hospitals, because he will lose access to their electronic medical records.

190.

Dr. Carney, if Defendant goes forward with its plan to terminate his employment, will lose access to his Emory hospital email, which contains his Grady patients' medical records and his confidential communications with his counsel.

191.

Dr. Carney, as part of his extraordinary skill for performing reconstructive surgery, is a top flight trauma surgeon.

192.

Defendant's planned replacement for Dr. Carney is not a trauma surgeon.

193.

Many Grady patients needing Urology trauma surgery will not be able to receive care and treatment from Dr. Carney.

194.

Dr. Swavely, who has entered into a year contract with Defendant to be a Urology Fellow under Dr. Carney's direction and supervision from August 1, 2021 to July 31, 2022, will lose a year of her professional life.

195.

Dr. Swavely's loss of a year of her professional life will cause her to suffer irreparable harm.

196.

There is no one else at the SOM's Urology Department, who can provide the training to Dr. Swavely that Dr. Carney would provide.

## COUNT ONE

## DR. CARNEY'S RIGHT UNDER THE ADA TO INJUNCTIVE RELIEF

197.

Dr. Carney reincorporates paragraphs "1" through "196" as if fully stated herein.

198.

Title 42 U.S.C. § 12112(d)(4)(A) prohibits employers from requiring a medical examination or making inquiries of an employee as to whether such employee is an individual with a disability ... unless such examination or inquiry is shown to be job-related and consistent with business necessity.

199.

Employees can be instructed to undergo medical examinations by employers only in certain limited circumstances, confined by the job-relatedness and business necessity requirements.

200.

The ADA was intended to prevent against medical tests and inquiries that do not serve a legitimate business purpose.

201.

The EEOC has explained that the above stated restriction reflects Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs. (EEOC Employment Guidance: Disability Related Injuries and Medical Examinations of Employers under the Americans with Disabilities Act at 4).

202.

Defendant's planned termination of Dr. Carney for refusing the demanded psychological counseling will cause Dr. Carney to suffer irreparable harm for which he has no adequate remedy at law.

203.

The equities tip decidedly in Dr. Carney's favor.

204.

The entry of the requested injunctive relief will be in the public's interest.

Wherefore, Dr. Carney requests the Court to enter a judgment against

Defendant:

(a)     Awarding Dr. Carney a temporary restraining order, interlocutory injunction and permanent injunction enjoining Defendant, its officers, agents, servants, employees and attorneys, as well as all persons in active concert or participation with them, from interfering in any manner with Dr. Carney's continued employment by Defendant's SOM;

(b)     Awarding Dr. Carney his costs of litigation including attorney's fees; and

(c)     Awarding Dr. Carney whatever other relief the Court deems just and proper.

# COUNT TWO

## DR. CARNEY'S ENTITLEMENT TO INJUNCTIVE
## RELIEF BECAUSE OF HIS QUASI-TENURE RIGHTS

205.

Dr. Carney reincorporates paragraphs "1" through "196" as if fully stated herein.

206.

Dr. Carney, for the past several years, had the reasonable expectation that he has continuous faculty status.

207.

Defendant treated Dr. Carney as if he has continuous faculty status.

208.

A long-term faculty member, who reasonably believes from longevity as a faculty member and the University's statements and actions that the faculty member has continuous faculty status, has quasi-tenure.

209.

A quasi-tenured faculty status does not require any confirming documentation.

54

210.

A quasi-tenured faculty status does not require any official appointment.

211.

A faculty member's quasi-tenure status restricts the SOM's ability to terminate the faculty member.

212.

A quasi-tenured faculty member has the rights of continued employment similar to that of a tenured faculty member.

213.

A quasi-tenured faculty member can be terminated only for the reasons that a faculty with a continuous appointment can be terminated.

214.

Dr. Carney, by his 20 years on the SOM's faculty and the SOM's actions as well as statements by the SOM's leadership, has quasi-tenure.

215.

None of the grounds entitling the SOM to terminate a continuous faculty member apply to Dr. Carney.

216.

The SOM has announced its intention to terminate Dr. Carney's faculty status August 31, 2021.

217.

The SOM, despite the fact that it has not presented another contract to Dr. Carney after his initial August 16, 2001 contract, falsely claims that Dr. Carney's faculty appointment expires August 31, 2021.

218.

The SOM states that it will not renew Dr. Carney's faculty appointment when it allegedly expires August 31, 2021.

219.

The SOM's statement that Dr. Carney's faculty appointment expires August 31, 2021 is not merely wrong but is profoundly wrong.

220.

Dr. Carney's continuous faculty status does not expire.

221.

Dr. Carney's continuous faculty status, because it does not expire, does not have to be renewed.

222.

Dr. Carney's continuous faculty status continues without being renewed.

223.

A quasi-tenured faculty member has the due process rights similar to those of a tenured faculty member.

224.

Defendant failed to provide the due process to which Dr. Carney is entitled.

225.

Defendant has failed to provide any due process to Dr. Carney.

226.

Dr. Carney has a likelihood of prevailing on the merits.

227.

The equities of whether or not to grant injunctive relief are in Dr. Carney's favor.

228.

The granting of equitable relief will be in the public interest.

229.

Defendant, in connection with violating Dr. Carney's quasi-tenure rights, has acted in bad faith.

230.

Dr. Carney, because of Defendant's bad faith conduct, is entitled, under O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Dr. Carney requests the Court to enter a judgment against Defendant:

(a)   Awarding Dr. Carney a temporary restraining order, interlocutory injunction and permanent injunction enjoining Defendant, its officers, agents, servants, employees and attorneys, as well as all persons in active concert or participation with them, from interfering in any manner with Dr. Carney's continued employment by Defendant's SOM;

(b)   Awarding Dr. Carney his costs of litigation including attorney's fees; and

(c)   Awarding Dr. Carney whatever other relief the Court deems just and proper.

**GARY BUNCH, P.C.**

By: _____
Gary Bunch
Georgia Bar Number 094612
Attorney for Plaintiff K. Jeff Carney, M.D.,
Pharm D.

208 Corporate Drive
Carrollton, Georgia 30117
(770) 836-0405

July 13, 2021

June 7, 2021                    **Career Conference and Performance Review**    Print this Page

2013

## Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | |
| Evaluator | Sanda, Martin  Professor And Chair |

### Time Allocation

This document is not meant to reflect your official effort commitment as documented on the biannual Effort Certification Form. However, this estimate should be a realistic reflection of your activity and not vary significantly from your Effort Certification.

0 % research          0 % teaching          0 % patient care

0 % administration    0 % consulting        0 % other (specify):

Are there any activities in which you would like to spend

More time?          No

Less time?          No

### Scholarship

**Publications** (past academic year)

**Extramural research support:** ( past academic year)

**Intramural research support:** ( past academic year)

### Teaching

**Medical, graduate, or allied health students:**

Course or program directorships

| | |
|---|---|
| Lectures (contact hours) | 0 |
| All Teaching (contact hours)(e.g. bedside, small group, med school lab): | 0 |
| Other (e.g. thesis, reading thesis and examination committees) | |

**Residents and clinical or postdoctoral fellows:**

Fellowship or residency program director

| | |
|---|---|
| Lectures (contact hours) | 0 |
| Teaching (contact hours) | 0 |
| Other (including bedside teaching) | |

**Faculty Development and Mentoring:**

Who are your mentors?

Who are your mentees?

**National and regional lectures, symposia, visiting professorships, CME courses, workshops:**

**Organization of National and International Conferences:**

**Teaching Awards:**

**Courses Attended:**

Continuing Medical Education Courses

Career Development Courses

### Service

**Clinical:**

| | |
|---|---|
| Number of weeks of inpatient clinical coverage (per year) | 0 |
| Number of half-day clinics (per year) | 0 |
| Number of week day nights oncall (per year) | 0 |
| Number of weekend call days (per year) | 0 |

Exhibit "A"

6/7/2021                    Emory University School of Medicine Career Conference and Performance Review

**Clinical Service:**
Describe clinical responsibilities, location, site, and impact.

**Quality:**
(Describe your efforts to assess and improve the quality of care provided by you, your colleagues and your team.)

**Administrative responsibilities (if applicable):**
(institutional committees, unpaid consulting, regional, national, and international societies, and national committees and leadership positions, community service)

## Awards and Notable Achievements

Society officer

Study sections

Advisory committees

Editorial boards

Titled lectureships

National and international prizes

Patents

**Describe any awards and notable achievements:**

## Goals

**FY 2012 Goals and Success**
(proposed by faculty member)

**Success in Achieving Goals**
(filled out jointly)

1. Expand Grady Urology - succesful in patient volume, % insured, and support by Grady leadership with spec FTE expansion request pending approval. 2. Organize CV - partially copmleted 3. REgional/national educaton - reconstructive surgery courses and service

**This Year's Goals and Success**
(proposed by faculty member)

**Action Plan**
(filled out jointly)

1. guide building & move into new Urology clinic 2. on-board recosntructive fellow (Dr. Ng), empower her to enable shcolarship 3. on-board and clinical mentorship/grady path and surgical maturation for new faculty recruits 4. empower administratie support and how to use it 5. Refine leadership skills and self-awareness

**Items for discussion: Other topics you would like to discuss**

## Part II

|  | Needs Improvment | Meets Expectations | Exceeds Expectations | NA |
|---|---|---|---|---|
| Scholarship |  | ✕ |  |  |
| Teaching |  |  | ✕ |  |
| Clinical Service |  |  | ✕ |  |
| Professional Service |  |  | ✕ |  |
| National Contributions |  |  | ✕ |  |
| Overall Contributions to Deparmtent |  |  | ✕ |  |

### Narrative Summary

Principal mentors are G Jordan and J McAninch, Jeff will seek to identify one or two mentors at Emory - eg Dr. Issa, build and formalize that relationship - eg meet quarterly two along minimum 90 minutes meeting is about Jeff. Move to MEST track, with guidance from Sharon Weiss re: timing of promotion to Assoc Prof and whether additional items are needed. We will find out about implications of promotion for compensation from Grady and adjust plan accordingly and clarify for Jeff timing of copmensation adjustments.

## Part III

6/7/2021                    Emory University School of Medicine Career Conference and Performance Review

**Faculty Comments:**

## Part IV

**Upload PDF Chair Comments of Faculty Review** (chair_firstname_lastname_year.pdf):

[ Choose File ] No file chosen          [ Upload Chair Review ]

**Or Enter Chair Comments:** (Up to 4000 Characters)

| | | |
|---|---|---|
| **Evaluator Signature Equivalent:** | Sanda, Martin | **Date:** 11/05/2013 |
| **Faculty Signature Equivalent:** | Kenneth Jeff Carney | **Date:** 11/19/2013 |

[ Print this Page ]

6/7/2021    Emory University School of Medicine Career Conference and Performance Review

June 7, 2021    **Career Conference and Performance Review** | Print this Page |
2015

## Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | |
| Evaluator | Sanda, Martin  Professor And Chair |

### CV

View Attached CV: KENNETHEFFCARNEYCV 5-17-13.doc 📎

**Describe any awards and notable achievements:**

### Goals

**FY 2014 Goals and Success**
(proposed by faculty member)
opened new grady urology clinic
**Success in Achieving Goals**
(filled out jointly)
new clinic - done change to MEST - done second consec fellow transition - done increase dr chang role - done course director at AUA visiting professor MCG and EVMS Lavonne starts as Assistant

**This Year's Goals and Success**
(proposed by faculty member)
 increase block time and faculty support at grady
**Action Plan**
(filled out jointly)
1) Submit promotion materials for MEST early - Lavonne helping 2) Increase role in res applicants to core interview team - 2/4 dates 2015, plan 4/4 in 2016 3) Continue to strategize with Dustin Diggs for more OR time 4) Onboarding Aaron Lay 5) encourgae/increase expectation of consistent presence of a reisdent in recon clinic Wednesday, recon OR thursday 6) increase Chang FTE with ESWL in the clinic 7) build relationship with new CMO 8) fellow selection for 2017 9) mission surgical care- engage medical students, include fellow in Haiti trip

### Items for discussion: Other topics you would like to discuss

expanding fellowship to include 2 fellows

## Part II

| | Far Below Expectations | Below Expectations | Meets Expectations | Exceeds Expectations | Far Exceeds Expectations | NA |
|---|---|---|---|---|---|---|
| Scholarship | | | ✕ | | | |
| Teaching | | | | ✕ | | |
| Clinical Service | | | | | ✕ | |
| Professional Service | | | | ✕ | | |
| National Contributions | | | | | ✕ | |
| Overall Contributions to Deparment | | | | ✕ | | |

### Narrative Summary

 Jeff is a cornerstone of Emory Urology present aand future. Grady expansion and growing impact of reconstructive urology training - residents or fellows - is and should continue to rise as flagship program of Emory urology. generally a high funtions academician, opportunities to refnie/enhance reisdent and fellow interface and detail/operational management at Grady. Will explore executiv ecoach for admin leadership development

## Part III

**Faculty Comments:**

## Part IV

**Upload PDF Chair Comments of Faculty Review (chair_firstname_lastname_year.pdf):**
| Choose File | No file chosen    | Upload Chair Review |

6/7/2021                    Emory University School of Medicine Career Conference and Performance Review

**Or Enter Chair Comments:** (Up to 4000 Characters)

| | | | |
|---|---|---|---|
| **Evaluator Signature Equivalent:** | Sanda, Martin | **Date:** | 11/06/2015 |
| **Faculty Signature Equivalent:** | Kenneth Jeff Carney | **Date:** | 11/20/2015 |

Print this Page

June 7, 2021      **Career Conference and Performance Review**   Print this Page

2016

# Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | 11/18/0016 |
| Evaluator | Sanda, Martin  Professor And Chair |

**Describe any awards and notable achievements:**

Visiting Faculty The 4th Mekelle Medical Education Collaboration (MMEC) CME on Urogynecology-II sponsored by The World Wide Fistula Fund Mekelle University, College of Health Sciences, Mekelle, Ethiopia

## Goals

**FY 2015 Goals and Success**
(proposed by faculty member)

increase block time and faculty support at grady

**Success in Achieving Goals**
(filled out jointly)

continued success in expanding Emory Urology at Grady, including addition of new faculty member (Lay)

**This Year's Goals and Success**
(proposed by faculty member)

Promotion to Associate Professor

**Action Plan**
(filled out jointly)

a) Academic: complete CV, submit to Dept FCAP by Dec 1, then follow in working on Teaching and Service portfolio with member of Urology FCAP and Toni Cross b) Teaching: improve participation at Grand Rounds, especially M/M. Find ways to better engage residents in cases wher the fellow is participating c) service: continue leading as Urology Service Chief at GMH...show team leadership by continuing to participate in off-hours call

**Items for discussion: Other topics you would like to discuss**

A Full Time Faculty partner at Grady

## Part II

| | Far Below Expectations | Below Expectations | Meets Expectations | Exceeds Expectations | Far Exceeds Expectations | NA |
|---|---|---|---|---|---|---|
| Scholarship | | | ✕ | | | |
| Teaching | | | | | ✕ | |
| Internal Service | | | | ✕ | | |
| External Service | | | | ✕ | | |
| Citizenship | | | | ✕ | | |
| Overall Performance Assessment | | | | ✕ | | |

## Narrative Summary

Dr. Carney is a pleasure to work with, He blends leadership with team service in a selfless way. He has unwavering work ethic and care passionately about his patients, about our Urology trainees (students, residents, and fellows), about his faculty colleagues, and about the staff who comprise his team at Grady. He communicates effectively with colleagues and leadership in the department and effectively enlists administration/management team members as needed. I continue to encourage him to submit his promotion portfolio to the Department FCAP and have repeatedly explained to him that I believe he has met criteria for promotion, that the only thing holding the promotion back is the need for him to assemble the materials (CV and teaching and service portfolio), with which we are offering him help and guidance from the Department.

## Part III

**Faculty Comments:**

## Part IV

**Upload PDF Chair Comments of Faculty Review (chair_firstname_lastname_year.pdf):**
Choose File   No file chosen    Upload Chair Review
**Or Enter Chair Comments:** (Up to 4000 Characters)

| | | | |
|---|---|---|---|
| **Evaluator Signature Equivalent:** | Sanda, Martin | **Date:** | 11/18/2016 |
| **Faculty Signature Equivalent:** | Kenneth Jeff Carney | **Date:** | 11/20/2016 |

Print this Page

6/7/2021                    Emory University School of Medicine Career Conference and Performance Review

June 7, 2021                    **Career Conference and Performance Review** [Print this Page]
                                                  2017

# Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | 12/15/2017 |
| Evaluator | Sanda, Martin  Professor And Chair |

**Describe any awards and notable achievements:**
Obtained GURS certification for Reconstructive fellowship

## Goals

**FY 2016 Goals and Success**
(proposed by faculty member)
Promotion to Associate Professor
**Success in Achieving Goals**
(filled out jointly)

**This Year's Goals and Success**
(proposed by faculty member)
Promotion to Associate Professor Develop Mentorship Skills
**Action Plan**
(filled out jointly)

**Items for discussion: Other topics you would like to discuss**
Grady Urology Service

# Part II

| | Below Expectations | Needs Development | Commendable | Accomplished | Exemplary | NA |
|---|---|---|---|---|---|---|
| Scholarship | | | ✕ | | | |
| Teaching | | | | | ✕ | |
| Internal Service | | | | | ✕ | |
| External Service | | | | ✕ | | |
| Citizenship | | | | | ✕ | |
| Overall Performance Assessment | | | | ✕ | | |

## Narrative Summary

Dear Jeff, Thank you for taking the time to submit your updated CV, past year's accomplishments, this year's goals and long-term goals onto the Emory School of Medicine CCPR website, and for meeting with me on December 15, 2017 to review your performance as an Emory Urology faculty member, as well as to discuss how the Urology Department can facilitate your career development and job satisfaction. A summary of this review and career development plan are summarized as follows, in the context of the Emory SOM and Urology Department's mission goals of Education/Teaching, Innovation/Scholarship, Internal Service, External Service, and Citizenship/Professionalism (ie adherence to the Emory SOM Pledge), with your performance in each of these 4 goals rated based on the Emory SOM CCPR performance evaluation metrics. In addition, I have taken the opportunity of the annual review process to re-emphasize the importance of your contribution to mentorship of others and/or plans for your receiving mentorship and ongoing guidance and advice regarding your own career development. EDUCATION: You have provided pivotal contribution in education through your role as Site Director of the Emory Urology Residency for the EUH rotation; your leadership, with Dr. Galloway, of the Reconstructive Urology Fellowship, for which you secured certification by the GURS; your serving on the Emory Urology Resident Applicant Interview Committee; and your providing invaluable operative clinical teaching of urological to Urology residents, especially as relates to operative techniques and perioperative care in reconstructive urology. Additionally, you have continued to teach M-III UME and M-IV subinterns in the OR and clinic. Accordingly, your performance in teaching during the past year is rated as exemplary. In the coming years, the Urology Department would benefit from your continued leadership as GME site Director for the Grady location, your leadership of the Emory GURS Fellowship, and your continued participation in mentoring of medical students, residents, and junior faculty alike. INNOVATION/SCHOLARSHIP: You have participated in scholarship by being a collaborator in reconstructive urology research being begun by Dr Hartsell, Dr. David, and Dr. Aliperti. Accordingly, in context of the MEST track of your faculty appointment, your performance in scholarship during the past year has been commendable. In the coming year, the Department would benefit from your continuing to encourage, enable, and help guide the research activities of the Reconstructive Urology Fellow as well as the research activities of junior faculty at Grady (eg Dr. Lay). INTERNAL SERVICE: You have participated in multiple internal service roles in your capacity as the Chief of the Urology Service at Grady, which continues to be, per your leadership, among the model surgical services at Grady Memorial Hospital. Notably,

you continue to have one of the most productive subspecialty clinical practices among Emory Urology faculty, in your practice that focuses on GU reconstruction, and for which you have established a reputation as the premier reconstructive urological surgeon in the Georgia-Alabama-South Carolina-Florida region. Your practice exemplifies a regional "top-of-subspecialty" expertise that is a model for junior faculty in urology to emulate. Accordingly, your contribution to internal service at Emory in the past year is rated as exemplary. In the coming years, Emory SOM the Department would benefit from your continued leadership and contribution to these existing internal service endeavors. EXTERNAL SERVICE: You have participated in leadership roles in professional society activities of the GURS and the AUA, including your participation in AUA Guidelines for trauma and reconstructive urology, and your role as faculty in the Reconstructive Urology course at the national AUA meeting. Accordingly, your contribution in external service during the past year has been accomplished. In the coming year(s), continuing your contributions in these professional groups and seeking related leadership roles will be helpful for enabling the goal of your eventual academic promotion on the MEST Track, which will depend predominantly on your accomplishments in national levels of service.
CITIZENSHIP/PROFESSIONALISM: You have demonstrated consistency of temperament in a busy and stressful environment, and navigated challenging circumstances with poise, while showing equally exceptional effectiveness as a service leader in Urology at Grady Memorial Hospital, despite capacity limitations in the Grady OR's. You have been a very positive ambassador of Emory Urology in the region, and beyond. Accordingly, your adherence to citizenship and professionalism in the past year has been exemplary.
MENTORSHIP: During the performance review meeting, we discussed the importance and opportunity, for you to further prioritize your role as a mentor for junior and mid-career faculty in the Urology Department. You mentioned your mentorship activities in coaching and enabling the career development of Dr. Lindsey Hartsell (who just completed the reconstructive fellowship) and Dr. Sam David (current fellow), and I encouraged you to further formalize your mentor role in their career, such as through regular individual meetings with each throughout the year (eg to discuss strategies for their career progress and/or other concerns), and for your formalizing your role and responsibility as being one of their primary mentors. We also discussed the pivotal importance of your potential as a mentor for Dr. Aaron Lay, in your capacity as Chief of Service at one of his principal clinical care, teaching and research settings. I strongly encourage you to engage a more intentional mentorship role with Dr. Lay, and prioritize your enabling progress of his work in endourology and minimally invasive urology at Grady, and to provide him guidance regarding evolution of his teaching style, so as to benefit both him, and you, and the entire clinical service and education environment at Grady. Conversely, we discussed what individuals might be suitable mentors to help guide your career development. In this regard, we discussed Dr. Galloway as a suitable subspecialty mentor, and you mentioned Dr. Master as someone whom you could look toward for guiding you as you undertake the necessary next steps of assembling your teaching and service portfolios, so as to enable your eligibility and consideration for potential academic promotion.
OVERALL: Overall, your performance in the past year has been accomplished/outstanding. Two key opportunities to enable your performance to rise to an exemplary level, in the coming year, would be for you to complete your teaching & service portfolios (to enable your consideration for eligibility to be promoted in academic rank), and for you to engage and embrace more structured mentorship of junior faculty at the Grady location (eg Dr. Lay, to enhance team effectiveness in education, scholarship, and service). I look forward to meeting again with you in 2018, to explore how the Department can continue to facilitate your ongoing career development and success. With utmost respect and appreciation, Martin G. Sanda, MD

# Part III

**Faculty Comments:**

# Part IV

**Upload PDF Chair Comments of Faculty Review** (chair_firstname_lastname_year.pdf):

| Choose File | No file chosen |     Upload Chair Review     |

**Or Enter Chair Comments:** (Up to 4000 Characters)

| **Evaluator Signature Equivalent:** | Sanda, Martin | **Date:** | 12/30/2017 |
| **Faculty Signature Equivalent:** | Kenneth Jeff Carney | **Date:** | 01/13/2018 |

Print this Page

June 7, 2021          **Career Conference and Performance Review**          Print this Page

2018

# Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | 08/24/2018 |
| Evaluator | Sanda, Martin  Professor And Chair |

## CV

View Attached CV: Dr. Carney CV JAN 2018.docx 📎

**Describe any awards and notable achievements:**

Invited Faculty for 2018 Society of Laparoendoscopic surgeons meeting Georgia Urology Association Faculty, 2 talks in 2018

## Goals

**FY 2017 Goals and Success**
**(proposed by faculty member)**
Promotion to Associate Professor Develop Mentorship Skills
**Success in Achieving Goals**
**(filled out jointly)**


**This Year's Goals and Success**
**(proposed by faculty member)**
Continue to Grow the Grady GU service Submit 1 or 2 abstracts to SESAUA Promotion to associate Professor Expand present mentorship responsibilities Possibly Expand and grow the GURS Fellowship
**Action Plan**
**(filled out jointly)**


**Items for discussion: Other topics you would like to discuss**

# Part II

| | Below Expectations | Needs Development | Commendable | Accomplished | Exemplary | NA |
|---|---|---|---|---|---|---|
| Scholarship | | | x | | | |
| Teaching | | | | | x | |
| Internal Service | | | | | x | |
| External Service | | | | x | | |
| Citizenship | | | | | x | |
| Overall Performance Assessment | | | | x | | |

## Narrative Summary

Dear Jeff, Thank you for taking the time to submit your updated CV, past year's accomplishments, this year's goals and long-term goals onto the Emory School of Medicine CCPR website, and for meeting with me earlier this fall to review your performance as an Emory Urology faculty member, as well as to discuss how the Urology Department can facilitate your career development and job satisfaction. A summary of this review and career development plan are summarized as follows, in the context of the Emory SOM and Urology Department's mission goals of Education/Teaching, Innovation/Scholarship, Internal Service, External Service, and Citizenship/Professionalism (ie adherence to the Emory SOM Pledge), with your performance in each of these 4 goals rated based on the Emory SOM CCPR performance evaluation metrics. In addition, I have taken the opportunity of the annual review process to re-emphasize the importance of your contribution to mentorship of others and/or plans for your receiving mentorship and ongoing guidance and advice regarding your own career development. I. EDUCATION: You have provided significant contribution in education through teaching residents, students, and practicing urologists through activities including but not limited to the following: a) You secured certification by the GURS for the Reconstructive Urology Fellowship, which you lead, and led successful participation by the fellowship in the GURS Fellowship match for the first time b) Serving as Site Director of the Emory Urology Residency for the EUH rotation, and in this capacity providing invaluable operative clinical teaching of urological to Urology residents, especially as relates to operative techniques and perioperative care in reconstructive urology, c) You continue teaching M-III UME and M-IV subinterns in the OR and clinic, with Grady being one of 4 Emory sites where the subinterns spend their time, and the Grady rotation consistently receives the highest accolades from our visiting and Emory medical students alike Accordingly, your performance in teaching during the past year is rated as exemplary. In the coming years, the Urology Department would benefit from your continued leadership as GME site Director for the Grady location, your

leadership of the Emory GURS Fellowship, and your continued participation in mentoring of medical students, residents, and junior faculty. II. INNOVATION/SCHOLARSHIP: Your efforts and accomplishments in scholarship/innovation have been anchored in the innovative elements of your reconstructive urology practice. Moreover, you have provided constant encouragement to the reconstructive urology fellows in supervising their interrogation of outcomes of the reconstructive urology patients. The work that you helped inspire Dr Hartsell, Dr. David, and Dr. Aliperti to begin has led to abstracts submitted to regional and national meetings by the current fellow. Accordingly, in context of the MEST track of your faculty appointment, your performance in scholarship during the past year has been commendable. In the coming year, the Department would benefit from your continuing to encourage, enable, and help guide the research activities of the Reconstructive Urology Fellow as well as the research activities of junior faculty at Grady. III. INTERNAL SERVICE: You continue to lead in multiple internal service roles in your capacity as the Chief of the Urology Service at Grady, which continues to be, per your leadership, among the model surgical services at Grady Memorial Hospital. Notably, you continue to have one of the most productive subspecialty clinical practices among Emory Urology faculty, in your practice that focuses on GU reconstruction, and for which you have established a reputation as the premier reconstructive urological surgeon in the Georgia-Alabama-South Carolina-Florida region. Your practice exemplifies a regional "top-of-subspecialty" expertise that is a model for junior faculty in urology to emulate. Accordingly, your contribution to internal service at Emory in the past year is rated as exemplary. In the coming years, Emory SOM the Department would benefit from your continued leadership and contribution to these existing internal service endeavors. IV. EXTERNAL SERVICE: You have participated in leadership roles in professional society activities of the GURS and the AUA, including your participation in AUA Guidelines for trauma and reconstructive urology, and your role as faculty in the Reconstructive Urology course at the national AUA meeting. Accordingly, your contribution in external service during the past year has been accomplished. In the coming year(s), continuing your contributions in these professional groups and seeking related leadership roles will be helpful for enabling the goal of your eventual academic promotion on the MEST Track, which will depend predominantly on your accomplishments in national levels of service. V. CITIZENSHIP/PROFESSIONALISM: You have demonstrated consistency of temperament in a busy and stressful environment, and navigated challenging circumstances with poise, while showing equally exceptional effectiveness as a service leader in Urology at Grady Memorial Hospital, despite capacity limitations in the Grady OR's. You have been a very positive ambassador of Emory Urology in the region, and beyond. Accordingly, your adherence to citizenship and professionalism in the past year has been exemplary. MENTORSHIP: You have been a highly effective mentor for the Reconstructive Urology Fellows, attested by several of them (Dr. Ng, Dr. Wyre, and now Dr. Hartsell) having proceeded to faculty positions at major academic medical centers. You have also become a valued mentor for junior faculty, highlights of which include your having found a perspective of complementary expertise to guide the development of Dr. Lay, your most junior faculty member at Grady, whose successes attest in part to the effectiveness of your mentorship. In the coming year, I encourage you to continue formalizing your mentor role for junior faculty, including Dr Hartsell and Dr. Lay, such as through regular individual meetings with each throughout the year (eg to discuss strategies for their career progress and/or other concerns), and for your formalizing your role and responsibility as being one of their primary mentors. Conversely, we discussed what individuals might be suitable mentors to help guide your career development, and especially your seeing through the responsibilities of your preparation of your service and teaching portfolios for consideration of your candidacy for academic promotion. Please reach out to Dr. Ritenour, Dr. Master, and me for guidance as you as you undertake the necessary next steps of assembling your teaching and service portfolios, so as to enable your eligibility and consideration for potential academic promotion. OVERALL: Overall, your performance in the past year has been accomplished/outstanding. Two key opportunities to enable your performance to rise to an exemplary level, in the coming year, would be for you to complete your teaching & service portfolios (to enable your consideration for eligibility to be promoted in academic rank), as per several emails you have received from myself and Dr. Ritenour (in his capacity as Chair of the Urology FCAP). I look forward to meeting again with you in 2019, to explore how the Department can continue to facilitate your ongoing career development and success. With utmost respect and appreciation, Marty Martin G. Sanda, MD

## Part III

**Faculty Comments:**

## Part IV

**Upload PDF Chair Comments of Faculty Review** (chair_firstname_lastname_year.pdf):

[ Choose File ] No file chosen        [ Upload Chair Review ]

**Or Enter Chair Comments: (Up to 4000 Characters)**

| | | | |
|---|---|---|---|
| **Evaluator Signature Equivalent:** | Sanda, Martin | **Date:** | 11/12/2018 |
| **Faculty Signature Equivalent:** | Kenneth Jeff Carney | **Date:** | 11/26/2018 |

[ Print this Page ]

6/7/2021                 Emory University School of Medicine Career Conference and Performance Review

June 7, 2021                **Career Conference and Performance Review**   [Print this Page]
                            **2019**

## Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | 08/01/2019 |
| Evaluator | Sanda, Martin  Professor And Chair |

**Describe any awards and notable achievements:**
Promoted to Associate Prof.

## Goals

**FY 2018 Goals and Success**
(proposed by faculty member)
Continue to Grow the Grady GU service Submit 1 or 2 abstracts to SESAUA Promotion to associate Professor Expand present mentorship responsibilities Possibly Expand and grow the GURS Fellowship

**Success in Achieving Goals**
(filled out jointly)

**This Year's Goals and Success**
(proposed by faculty member)
Continue to Grow the Grady GU service Submit 1 or 2 abstracts to SESAUA Promotion to associate Professor Expand present mentorship responsibilities Possibly Expand and grow the GURS Fellowship

**Action Plan**
(filled out jointly)

**Items for discussion: Other topics you would like to discuss**
Increase in Compensation

## Part II

| | Below Expectations | Needs Development | Commendable | Accomplished | Exemplary | NA |
|---|---|---|---|---|---|---|
| Scholarship | | | ✕ | | | |
| Teaching | | | | | ✕ | |
| Internal Service | | | | | ✕ | |
| External Service | | | | ✕ | | |
| Citizenship | | | | | ✕ | |
| Overall Performance Assessment | | | | ✕ | | |

### Narrative Summary

View Attached Summary: Carney_2019 CCPR.pdf 📎
Please see attached evaluation summary that was emailed on August 26, 2019 to Dr Carney

## Part III
**Faculty Comments:**

## Part IV

**Upload PDF Chair Comments of Faculty Review** (chair_firstname_lastname_year.pdf):
[Choose File] No file chosen   [Upload Chair Review]
**Or Enter Chair Comments:** (Up to 4000 Characters)

6/7/2021

Emory University School of Medicine Career Conference and Performance Review

**Evaluator Signature Equivalent:**     Sanda, Martin     **Date:**  10/16/2019

**Faculty Signature Equivalent:**     Kenneth Jeff Carney   **Date:**  10/30/2019

Print this Page



EMORY
UNIVERSITY
SCHOOL OF
MEDICINE

**Department of Urology**

Martin G. Sanda, MD
*Professor of Urology*
*Chairman and Chief of Service*
*Director, Prostate Cancer Center*
*Winship Cancer Institute of Emory University*

Annual Career Conference and Performance Review: 2019
August 22, 2019
Jeff Carney, MD, PharmD

Dear Jeff,

Thank you for submitting your updated CV, accomplishments, and goals onto the Emory School of Medicine CCPR website, as well as for meeting with me earlier this summer to review your performance and discuss how Emory Urology can facilitate your job satisfaction.

A review of your performance in the past year and career development plan looking ahead are summarized as follows, in the context of the Emory School of Medicine's and Urology Department's mission goals of Education, Innovation/Scholarship and Service, as well as your demonstration of citizenship, professionalism, and adherence to the Emory SOM Pledge.

I.  EDUCATION:

You have provided significant contribution in education through teaching residents, students, and practicing urologists through activities including but not limited to the following:
   a)  You are the faculty Director for the Reconstructive Urology Fellowship, for which you had secured certification by the GURS, and secured a successful GURS Fellowship match for the second consecutive year
   b)  You continue serving as Site Director of the Emory Urology Residency for the Grady rotation, and in this capacity provide invaluable operative clinical teaching of urological to Urology residents, especially as relates to operative techniques and perioperative care in reconstructive urology.
   c)  You continue teaching M-III UME and M-IV subinterns in the OR and clinic, with Grady being one of 4 Emory sites where the subinterns spend their time, and the Grady rotation consistently receives the highest accolades from our visiting and Emory medical students alike

**Accordingly, your performance in teaching during the past year is rated as <u>exemplary</u>.**

In the coming years, the Urology Department would benefit from your continued leadership as GME site Director for the Grady location, your leadership of the Emory GURS Fellowship, and your continued participation in mentoring of medical students, residents, and junior faculty.

II. INNOVATION/SCHOLARSHIP:

Your efforts and accomplishments in scholarship/innovation have been anchored in the innovative elements of your reconstructive urology practice.  Moreover, you have provided constant encouragement to the reconstructive urology fellows in supervising their interrogation of outcomes of the

**The Emory Clinic**                                    Tel 404.778.6874
1365 Clifton Road NE                               Fax 404.778.0995
Building B, Suite 1400                              msanda@emory.edu
Atlanta, GA 30322                                    www.urology.emory.edu

**The Robert W. Woodruff Health Sciences Center**
*An equal opportunity, affirmative action university*

reconstructive urology patients. The work that you helped inspire Dr. Hartsell, Dr. David, Dr. Aliperti has led to abstracts submitted to regional and national meetings by Dr. Cancian.

**Accordingly, your performance in scholarship during the past year has been commendable.**

In the coming year, the Department would benefit from your continuing to encourage, enable, and help guide the research activities of the Reconstructive Urology Fellow as well as the research activities of junior faculty at Grady.

III. INTERNAL SERVICE:

You continue to lead in multiple internal service roles in your capacity as the Chief of the Urology Service at Grady, which continues to be, per your leadership, among the model surgical services at Grady Memorial Hospital. Notably, you continue to have one of the most productive subspecialty clinical practices among Emory Urology faculty, in your practice that focuses on GU reconstruction, and for which you have established a reputation as the premier reconstructive urological surgeon in the Georgia-Alabama-South Carolina-Florida region. Your practice exemplifies a regional "top-of-subspecialty" expertise that is a model for junior faculty in urology to emulate.

Notably, after expressing an interest in potentially opting out of call as of September 2019, you heard concerns I communicated, about how such a change would be highly disruptive and could induce a cascade of team disengagement from one of our most fundament pillars of teamwork in the Department: that of shared responsibility for off-hours call. You're subsequently agreeing to continue to participate in off-hours call is greatly appreciated, especially as you already perform more than your share of call coverage because you routinely cover off-hours trauma emergencies at Grady on many nights/weekends when you are not on call.

**Accordingly, your contribution to internal service at Emory in the past year is rated as exemplary.**

In the coming years, Emory SOM the Department would benefit from your continued leadership and contribution to these existing internal service endeavors.

IV. EXTERNAL SERVICE:

You have participated in leadership roles in professional society activities of the GURS and the AUA, including your participation in AUA Guidelines for trauma and reconstructive urology, and your role as faculty in the Reconstructive Urology course at the national AUA meeting.

**Accordingly, your contribution in external service during the past year has been accomplished.**

In the coming year(s), continuing your contributions in these professional groups and seeking related leadership roles will be helpful for promoting the your national reputation and the visibility of the Emory GURS Fellowship under your directorship. .

V. CITIZENSHIP/PROFESSIONALISM:

You have demonstrated consistency of temperament in a busy and stressful environment, and navigated challenging circumstances with poise, while showing equally exceptional effectiveness as a

service leader in Urology at Grady Memorial Hospital, despite capacity limitations in the Grady OR's. You have been a very positive ambassador of Emory Urology in the region, and beyond.

You have shown flexibility and were open to feedback regarding the interest you had voiced about the possibility of your opting out from off-hours call participation. I am delighted that you agreed to continue participating in call in FY20 and look forward to continued dialogue with you about how we can mitigate the burden of your call coverage, to make it possible to extend the longevity of your team participation.

**Accordingly, your adherence to citizenship and professionalism in the past year has been exemplary.**

MENTORSHIP:

You have been a highly effective mentor for the Reconstructive Urology Fellows, attested by several of them (Dr. Ng, Dr. Wyre, Dr. Hartsell, and Dr. Cancian) having proceeded to faculty positions at major academic medical centers. You have also become a valued mentor for junior faculty, highlights of which include your having found a perspective of complementary expertise to guide the development of Dr. Lay, your most junior faculty member at Grady, whose successes attest in part to the effectiveness of your mentorship.

In the coming year, I encourage you to continue formalizing your mentor role for junior faculty, including Dr. Hartsell and Dr. Lay, such as through regular individual meetings with each throughout the year (e.g. to discuss strategies for their career progress and/or other concerns), and for your formalizing your role and responsibility as being one of their primary mentors.

OVERALL:

**Overall, your performance in FY19 has been accomplished/outstanding.**

Congratulations once again on your academic promotion to Associate Professor. I look forward to meeting again with you again soon, to explore how the Department can continue to facilitate your ongoing career development and success and the success of Emory Urology at Grady under your leadership.

With respect and appreciation,

Martin G. Sanda, MD

6/7/2021 Emory University School of Medicine Career Conference and Performance Review

June 7, 2021 **Career Conference and Performance Review** Print this Page

2020

# Part I

| | |
|---|---|
| Name | Kenneth Jeff Carney |
| Rank/Title | Associate Professor - SOM |
| Track | Not Applicable |
| Appointment or Last Promotion Date | 09/01/2019 |
| Department | Urology |
| Division | Urology |
| Date of Conference | 07/17/2020 |
| Evaluator | Sanda, Martin  Professor And Chair |

## CV

View Attached CV: Carney, Kenneth-Urology-Curriculum Vitae-2-2.docx

**Describe any awards and notable achievements:**

## Goals

**FY 2019 Goals and Success**
(proposed by faculty member)
Continue to Grow the Grady GU service Submit 1 or 2 abstracts to SESAUA Promotion to associate Professor
Expand present mentorship responsibilities Possibly Expand and grow the GURS Fellowship
**Success in Achieving Goals**
(filled out jointly)
  SEE SUMMARY

**This Year's Goals and Success**
(proposed by faculty member)
  CONTINUE TO GROW THE GRADY UROLOGY SEVICE AND FACULTY IMPROVE THE GURS
  FELLOWSHIP BE MORE INVOLVED IN MEDICAL STUDENT EDUCATION BE THE IDEAL MENTOR AND
  TEACHER FOR ALL OUR RESIDENTS BE A ADVOCATE FOR EMORY AND GRADY
**Action Plan**
(filled out jointly)
  SEE SUMMARY

**Items for discussion: Other topics you would like to discuss**
  GURS FELLOWSHIP

# Part II

| | Below Expectations | Needs Development | Commendable | Accomplished | Exemplary | NA |
|---|---|---|---|---|---|---|
| Scholarship | | | ✕ | | | |
| Teaching | | | | ✕ | | |
| Internal Service | | | | | ✕ | |
| External Service | | | | ✕ | | |
| Citizenship | | | | ✕ | | |
| Overall Performance Assessment | | | | ✕ | | |

## Narrative Summary

View Attached Summary: SUMMARY J Carney 2020.pdf

  ANNUAL REVIEW IS THE ATTACHED PDF DOCUMENT

# Part III

**Faculty Comments:**
  Having the opportunity to respond and provide feedback to allegations and terminology in my annual Career
Conference Performance Review is much appreciated. I find it more than coincidental that Dr. Sanda
responded to a very critical email I had sent him pertaining to concerns I voiced about he interfering and
weakening the GURS fellowship, which I direct, and he bullying the fellow at 8:38 AM on August 27; I then
receive the SOM-CCPR notification that Dr. Sanda has completed my less than stellar annual Career
Conference Performance Review a little more than 2 hours later at 10:55 AM on August 27. I find this a clear
example of an unwelcome repercussion for my standing up to Dr. Sanda and confronting his inflexible,
intimidating, manipulative, and Machiavellian tactics. My biggest mistake during this year's annual CCPR was
meeting with Dr. Sanda alone. I have been warned by other senior faculty in our department to never go into a
meeting with Dr. Sanda alone so that it is his word against my word. I asked our departmental administrator Tari
Owi to be present, but he conveniently "forgot" to send her the zoom invite until the last 10 minutes.
Coincidence? I think not, A lesson learned on my behalf? Most definitely. For these reasons, I will not be

attending any future meetings in which Dr. Sanda and I are alone. He makes me uncomfortable. It should be a requirement for someone else to be present with Dr. Sanda at all future faculty annual CCPRs. This is in stark contrast to our former chairman, Frey Marshall, where no one ever felt intimidated or uncomfortable to be alone in his presence. During the annual CCPR, Dr. Sanda tried relentlessly to strong-arm me into giving up the GME site directorship voluntarily. There is no documentation of me being subpar in my role as GME site director, and I have held this position for most of my 20 years at Grady. Dr. Sanda wants to give this title to a new faculty member who just started work on September 1, 2020. I adamantly refused. He then twisted my arm into giving up the UME site director title, again a job I have performed for most of my 20 years at Grady. I have no documented deficiencies in UME area. Fearing vengeance and repercussions, and knowing that I had used significant political capital to keep my GME title, I reluctantly agreed to give up the UME position to be given to an inexperienced new hire on his first day. Let the record show this was not voluntary, as described by Dr. Sanda in my annual CCPR. Initially, I found it hard to believe that Dr. Sanda chose to state that "the GME program at Grady has at times struggled with maintaining compliance with resident work hour guidelines." I appreciate the opportunity to set the record straight. I find it interesting that we did not discuss work hour violations during my annual evaluation, but it appeared in the final written version. I find it even more interesting that Dr. Sanda has chosen to critique me on work hour violations when he is why those work hour violations occurred. Truth be known, if there were resident work hour violations at Grady, they occurred during the last academic year and resulted from Dr. Sanda's Machiavellian and confrontational leadership style and inability to partner efficiently with our general surgery colleagues, which resulted in: 1) General surgery removing the quad call intern from the Grady urology service. In my 20 years serving as chief of urology at Grady, we have ALWAYS had a general surgery intern either rotating on the service or covering in-house quad night call. This most necessary team member was removed, and hence our urology service had no cross cover, which placed a huge burden on the junior team members. This loss was accompanied by the Grady service being short one resident, a PGY-4. One of our residents left the program two years ago, and the department decided not to replace him, which left us short on residents during a critical time of lacking quad call coverage. 2) The failure of Dr. Sanda to listen to my repeated pleas for increased fellow support at Grady. I am the fellowship director for the GURS reconstructive fellowship. On numerous occasions, I have pleaded with my chairman that due to Grady's uniqueness and the increasing number and unpredictability of GradyHospital traumas, I need more help. I have repeatedly requested my fellow to be full time at Grady, and the Grady administration has offered 100% support of the GURS fellow salary. However, Dr. Sanda refuses to allow the fellow to be at Grady full time. In their program evaluations, all fellows have requested spending more time with me. During the COVID-19 pandemic, we were short-staffed at Grady, and the fellow was placed at Grady full time. Since reinstituting the quad call intern and placing the fellow at Grady full time, we had ZERO resident work hour violations. Now it is perfectly clear to me the reason Dr. Sanda is not permitting my fellow to be at Grady, despite 100% salary commitment on Grady's behalf, he wants to criticize me for resident workhour violations, so he can unfairly strip me of my GME responsibilities in the near future. Suppose only Dr. Sanda would partner better with other services and me as Grady chief of service and GURS fellowship director and provide the relevant support. In that case, the above issues could be avoided. For the last 7 months, we have proven that even during the COVID-19 pandemic, we will not have urology resident work hour violations at Grady when appropriately supported by full-time GURS presence and when we partner effectively with general surgery for the quad call intern. I do not think one incident qualifies as a"struggle". It is so unfair to hold me responsible for resident work hour violations when removing the quad call intern was not my choice; if asked if I would have vehemently opposed. And, with the lack of relevant fellow support. Perhaps Dr. Del Rio or Dr. Jansen, the Grady CMO, can be involved in my future evaluations. For they, like me, work at Grady every day and are aware of Grady's increasing trauma numbers and my contributions and importance to the overall mission of Grady Hospital. Finally, I appreciate Dr. Sanda's comment—" Notably, you continue to have one of the most productive subspecialty clinical practices among Emory Urology faculty." I will make a bold prediction that this year, even in the middle of the COVID pandemic, when others have seen a decline in their productivity, my wRVU production will hold steady or possibly exceed last year.

## Part IV

**Upload PDF Chair Comments of Faculty Review** (chair_firstname_lastname_year.pdf):

[ Choose File ] No file chosen        [ Upload Chair Review ]

**Or Enter Chair Comments:** (Up to 4000 Characters)

I am sorry to read Dr. Carney's interpretation of his annual performance review meeting and perspective regarding my leadership. The Department Administrator, Tari Owi, was aware of the time for the review and an unforeseen other obligation impeded her participation. Dr. Carney's description of the meeting is inaccurate with regard to the style of dialogue and mutual collaborative conversation.  Regarding the GME concerns, I simply reiterated concerns that had previously been communicated to Dr. Carney in meetings led by the Urology GME Program Director, Dr. Mehta, in which I and others (Ms Owi and Dr Ritenour) have participated, so this was not new information to Dr Carney.

I am more than willing to include other Urology leaders in future meetings with Dr. Carney, and based on the manner in which he has misrepresented the content and conduct of this year's annual review, I will be sure to adjust the approach of communication with Dr.Carney to be team-based, to ensure clarity of content and tone.

| | | | |
|---|---|---|---|
| **Evaluator Signature Equivalent:** | Sanda, Martin | **Date:** | 08/27/2020 |
| **Faculty Signature Equivalent:** | Kenneth Jeff Carney | **Date:** | 09/08/2020 |

[ Print this Page ]

Annual Career Conference and Performance Review: 2020
Jeff Carney, MD, PharmD

Dear Jeff,

Thank you for taking the time to submit your updated CV, past year's accomplishments, this year's goals and long-term goals onto the Emory School of Medicine CCPR website, and for meeting with me earlier this fall to review your performance as an Emory Urology faculty member, as well as to discuss how the Urology Department can facilitate your career development and job satisfaction.

**A highlight of your accomplishments in the past year was your leadership in navigating Grady Urology through the pressures of the COVID pandemic. Grady and Emory Urology alike are indebted to your indefatigable efforts to maintain necessary urology services at Grady despite the pandemic**.

A summary of your annual review and career development plan are summarized as follows, in the context of the Emory SOM and Urology Department's mission goals of Education/Teaching, Innovation/Scholarship, Internal Service, External Service, and Citizenship/Professionalism (ie adherence to the Emory SOM Pledge), with your performance in each of these 4 goals rated based on the Emory SOM CCPR performance evaluation metrics.

In addition, I have taken the opportunity of the annual review process to re-emphasize the importance of your contribution to mentorship of others and/or plans for your receiving mentorship and ongoing guidance and advice regarding your own career development.

I.  EDUCATION:

You have provided significant contribution in education through teaching residents, students, and practicing urologists through activities and strengths of your performance including but not limited to the following:

   a) You continue as faculty Director for the Reconstructive Urology Fellowship and secured a successful GURS Fellowship match for the third consecutive year
   b) You continue serving as Site Director of the Emory Urology Residency for the EUH rotation, and in this capacity provide invaluable operative clinical teaching of urological to Urology residents, especially as relates to operative techniques and perioperative care in reconstructive urology.
   c) You continue teaching M-IV subinterns in the OR and clinic, with Grady being one of 4 Emory sites where the subinterns spend their time, and the Grady rotation is consistently receives accolades from visiting and Emory medical students alike.

However, the GME program at Grady has at times struggled with maintaining compliance with resident work hour guidelines, with successes in this regard counterbalanced by reports from residents to the GME Director. The residents have also reported being asked to perform duties that some of them consider to be inappropriately directive outside of normal duty hours. I understand you have begun dialogue with the GME Director about how to address these concerns.

Accordingly, your performance in teaching during the past year is rated as <u>accomplished.</u>

It is challenging for the Chief of the Clinical Service to serve, concurrently, as Site Director for the GME rotations, because the clinical service needs and priorities are not always aligned with those of the residents. On this basis, I asked when we met whether you would be willing to delegate the GME faculty lead role to another faculty member at Grady, and you emphasized that you want to maintain you GME leadership role. I urge you to consider selecting, together with Dr. Mehta as Urology GME PD, a faculty member to serve as Associate Site Director, to work under your tutelage in attending to some of the GME faculty tasks, and to broaden the opportunity for feedback from the residents and broaden your ability to determine and/or implement rotation adjustments and/or refinements as needed.

In order to broaden ownership of the education mission and leadership opportunities to some of the more junior Grady Urology faculty, you agreed to transition lead role in UME Site Directorship to Dr. Narayan. Thank you very much for agreeing to take this important step to broaden team ownership of leadership at Emory Urology at Grady, which will enhance engagement and career development of the junior faculty while broadening input for Urology UME at Grady.

Recently you advocated to change the scope of service of the GURS non-ACGME Fellow, including your request to remove the fellow from participating in the Reconstructive Urology clinic at EUH. That could be a somewhat drastic response to feedback from recent graduating fellows (that the EUH clinic time involved either too much general urology or too much time with one faculty member). I would ask you to consider whether/how the fellow feedback could be addressed with some compromise steps that could enhance the reconstructive learning at EUH, as a possible alternative to eliminating altogether the fellow's time at EUH (for example some manner of reducing and focusing the fellow clinic and balancing the time gained with research time, which you have also requested).

## II. INNOVATION/SCHOLARSHIP:

Your efforts and accomplishments in scholarship/innovation have been anchored in the innovative elements of your reconstructive urology practice.  Moreover, you have provided constant encouragement to the reconstructive urology fellows in supervising their interrogation of outcomes of the reconstructive urology patients. You have co-authored new publications and continue to encourage clinical research at Grady.

Accordingly, your performance in scholarship during the past year has been <u>commendable</u>.

In the coming year, the Department would benefit from your continuing to encourage, enable, and help guide the research activities of the Reconstructive Urology Fellow as well as the research activities of junior faculty at Grady.

## III. INTERNAL SERVICE:

You continue to lead in multiple internal service roles in your capacity as the Chief of the Urology Service at Grady, which continues to be, per your leadership, among the model surgical services at Grady Memorial Hospital. Notably, you continue to have one of the most productive subspecialty clinical practices among Emory Urology faculty, in your practice that focuses on GU reconstruction, and

for which you have established a reputation as a premier reconstructive urological surgeon in the Southeast.

A highlight of your internal service in the past year was your leadership in navigating Grady Urology through the pressures of the COVID pandemic.

Accordingly, your contribution to internal service at Emory in the past year is rated as <u>exemplary</u>.

In the coming years, Emory SOM the Department would benefit from your continued leadership and contribution to these existing internal service endeavors.

<u>IV. EXTERNAL SERVICE:</u>

You have participated in leadership roles in professional society activities of the GURS and the AUA, including your participation in AUA Guidelines for trauma and reconstructive urology. The COVID pandemic diminished these opportunities so it is understandable that your activities in the arena of external service may have been somewhat less in the past year than in prior years

Accordingly, your contribution in external service during the past year remains <u>accomplished</u>, i.e. preserving the rating of last year, despite reduced activity as such reduction is expected due to COVID pandemic.

In the coming year(s), continuing your contributions in these professional groups and seeking related leadership roles will be helpful for promoting the your national reputation and the visibility of the Emory GURS Fellowship under your directorship.

<u>V. CITIZENSHIP/PROFESSIONALISM:</u>

You have demonstrated consistency of temperament in a busy and stressful environment, and navigated challenging circumstances with poise, while showing equally exceptional effectiveness as a service leader in Urology at Grady Memorial Hospital, despite capacity limitations in the Grady OR's. You have been a positive ambassador of Emory Urology in the region, and you continue to contribute in teamwork by participating in off-hours call.

Accordingly, your adherence to citizenship and professionalism in the past year has been <u>accomplished</u>.

<u>MENTORSHIP:</u>

You have mentored the Reconstructive Urology Fellows, attested by several of them (Dr. Ng, Dr. Wyre, Dr. Hartsell, and Dr Cancian) having proceeded to faculty positions at major academic medical centers.

You have also mentored junior faculty, highlights of which include your having found a perspective of complementary expertise to guide the development of Dr. Lay, your most junior faculty member at Grady, whose successes attest in part to the effectiveness of your mentorship.

In the coming year, I encourage you to continue formalizing your mentor role for junior faculty, including Dr Hartsell, Dr. Lay, and Dr. Narayan, such as through regular individual meetings with each throughout the year (eg to discuss strategies for their career progress and/or other concerns), and for your formalizing your role and responsibility as being one of their primary mentors.

OVERALL:

**Overall, your performance in FY20 has been accomplished**.

I look forward to meeting again with you again soon, to explore how the Department can continue to facilitate your ongoing career development and success and the success of Emory Urology at Grady under your leadership.

With utmost respect and appreciation,

Martin G. Sanda, MD
Professor and Chair
Department of Urology

Approved by BOT
May 2017

# STATEMENT OF PRINCIPLES GOVERNING FACULTY RELATIONSHIPS ("THE GRAY BOOK")

*Academic Freedom and Responsibility*

A concern to provide a University atmosphere in which there is freedom to pursue truth and to discuss all relevant questions has led the trustees of Emory University to accept the general principles and purposes embodied in the 1940 Statement of Principles on Academic Freedom and Tenure that was originally cosponsored by the Association of American Colleges and the American Association of University Professors and subsequently endorsed by more than a score of major educational associations and learned societies.

According to the authors: "The purpose of this statement is to promote public understanding and support of academic freedom and tenure, and agreement of procedures to assure them in colleges and universities. Institutions of higher education are conducted for the common good and not to further the interest of either the individual faculty member or the institution as a whole. The common good depends on the free search for truth and its free exposition."

The 1940 Statement emphasizes that to ensure maximum effectiveness; faculty members should have security adequate for freedom to teach and to seek truth. This includes security of position after a reasonable period of probation, income commensurate with professional attainments, and assurance of explicit contract. As a citizen, the faculty member is also entitled to the right to participate in activities related to citizenship in a democratic society.

The 1940 Statement further emphasizes the correlative obligations and responsibilities imposed by the special position occupied by the faculty. Most important is the obligation for effective performance of duty. In addition, the 1940 Statement emphasizes that when a faculty member speaks or writes as a citizen, he or she should remember that the public may judge his or her profession and institutions by those utterances. Hence, a faculty member should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should indicate that he or she speaks as an individual and not for the institution.

With the acceptance by trustees, administrative officers, and faculty members of the related principles of freedom and obligation, an individual faculty member is assured of reasonable protection against arbitrary pressures and procedures; and the institution, students, and the general public are assured of reasonable protection against incompetence and irresponsible utterance.

*Appointment and Tenure:*

1. Appointments to the faculty shall be of two kinds: limited and continuous. A limited appointment is terminated at the close of a period of time specified in writing to the appointee. A continuous appointment is not to be terminated by the university except for adequate cause as specified below or by retirement in accordance with the provisions of the Emory University Retirement Plan.

2. (a)   As provided in Article IV, Sec. 3 of the By-Laws of Emory University: "Limited appointment shall be made by the Dean of the academic unit primarily concerned and shall be reported annually to the Provost and Executive Vice President for Academic Affairs or the Executive Vice President for Health Affairs, whomever is appropriate

Exhibit "B"

"Continuous appointments shall be made by the Board of Trustees or its Executive Committee upon the recommendation of the President who shall have conferred regarding such recommendation with the Dean of the academic unit primarily concerned and the appropriate academic Executive Vice President. "The deans shall establish and communicate to their faculty the procedures for expressing faculty opinion in matters of individual appointment, promotion and termination. The precise terms and conditions of each appointment shall be stated in writing, shall be in accordance with the principles approved and published by the Board of Trustees, and shall be in possession both of the University and the appointee before the appointment is final."

(b)     Copies of the procedures mentioned above shall be filed with the Provost and Executive Vice President for Academic Affairs, the Executive Vice President for Health Affairs, when appropriate, and the Executive Committee of the Faculty Council.

3.   *The Continuous Appointment Track:*   Except as otherwise provided herein, the following conditions shall apply to full-time appointments in the ranks of professor, associate professor, assistant professor, and instructor:

(a)     Appointments to the rank of professor shall be continuous.

(b)     Appointments to the rank of associate professor may be continuous or limited. Limited appointments at the rank of associate professor shall not exceed five years.

(c)     Appointments to the ranks of assistant professor on the tenure track and instructor shall be limited.

(d)     The duration of a limited appointment at the rank of assistant professor at Emory is established by the school or college in which the faculty member is appointed and is described in the tenure policies for that school. The time period is typically counted from the date of appointment. In certain cases, the years may be counted from the time the terminal degree is received. When a formal extension of the tenure clock has been granted, the time spent in a limited appointment may be extended beyond the school's stated time period.

(e)     Standards for appointments at rank, along with promotion and tenure, reflect the expectations that a faculty holds of its members. Each academic unit will set forth specific rules and guidelines for attaining a continuous appointment or promotion. Candidates for appointment or promotion to Associate Professor must show academic excellence, including meritorious scholarship, creative inquiry, and outstanding teaching, as well as have the demonstrated promise to become leaders and transform their field as their career progresses. Candidates for appointment or promotion to Professor must show scholarly excellence and be established, nationally or internationally, as among the most distinctive and recognized voices in their disciplines, consistently examining and addressing their fields' most pressing questions.

4.   *The Limited Appointment Track*: Appointment to the rank of professor (clinical), associate professor (clinical), assistant professor (clinical), instructor (clinical), professor (research), associate professor (research), assistant professor (research), instructor (research), professor (medical educator and service), associate professor (medical educator and service), assistant professor (medical educator and service), professor of practice, professor of pedagogy, or professor of performance), and instructor shall be limited. Limited appointments as Senior Associate and Associate only are used in the health

Approved by BOT
May 2017

sciences.*Such appointments carry no restrictions on years of service in these ranks and may be reserved for those individuals who serve in specialized capacities in which advancement to continuous appointment would not ordinarily be anticipated. Specific rules and guidelines for appointment and promotion on these limited appointments are set forth by each academic unit.

5.  In cases where appointment to one of the ranks enumerated above is inappropriate, the title of lecturer, special lecturer, senior lecturer may be given by the Dean of the academic unit primarily concerned and shall be reported annually to the Provost and Executive Vice President for Academic Affairs.  Such appointment shall be limited.

6.  Visiting, part-time, temporary, and uncompensated appointments are governed by the written conditions of each individual appointment but shall, in all cases, be limited. Such appointments shall not exceed three years and shall be reported annually to the Provost and Executive Vice President for Academic Affairs.  In the School of Medicine, two-year appointments of uncompensated volunteer faculty may be renewed based on performance and need.

    Appointments using the acting title Acting Associate Professor or Acting Professor shall be used only for new faculty members at the rank of Associate Professor or Professor whose tenure decision is pending review by the Board of Trustees or its Executive Committee.

7.  The terms of the limited appointment shall be stated in writing. Written notice of renewal for a limited appointment shall be provided by the Dean of the academic unit primarily concerned and shall be reported annually to the Provost and Executive Vice President for Academic Affairs or the Executive Vice President for Health Affairs. Written notice of non-renewal for a limited appointment shall be provided by the Dean of the academic unit primarily concerned and shall be reported annually to the Provost and Executive Vice President for Academic Affairs or the Executive Vice President for Health Affairs ideally six months, but at a minimum three months in advance of the end of the appointment. .

8.  In each case the Dean of the academic unit primarily concerned shall have conferred regarding any recommendation for appointment and, promotion for continuous faculty, appointments or nonrenewal of a limited faculty appointment with members of the department or faculty concerned, according to procedures, which shall have been previously established and communicated to the faculty.

9.  A member of the faculty who intends to resign shall give notice in ample time, preferably at least one academic semester, to permit the university to plan accordingly.

10. A member of the faculty who has served on a regular full-time basis continuously for a period of ten or more years and who is at least age fifty-five, and whose total age and years of continuous service equals at least seventy-five, may retire at the end of any semester at the option of the faculty member. Under unusual circumstances, appointments may be extended to retired faculty on a year-to-year basis by the Dean of the academic unit.

11. A retired member of the faculty who has reached age fifty-five and has served as a member of the Emory faculty for at least ten continuous years, and whose total age and years of continuous service equal at least seventy-five, may be considered for an  "emeritus" title that reflects rank and appointment track at the time of retirement.  Following rules and guidelines for academic titles, the Dean of the academic unit where the faculty member's appointment is housed may recommend a

---

* The use of the senior associate and associate title for limited faculty appointments currently is under review.

Approved by BOT
May 2017

faculty member to the Provost and Executive Vice President for Academic Affairs and the President, who shall inform the Board of Trustees, if awarded.

12. Continuous appointments may be terminated:

   (a) By resignation;

   (b) By retirement in accordance with the provisions of the Emory University Retirement Plan;

   (c) For one or more of the following reasons: moral delinquency, neglect of academic duty, incompetence, permanent physical or mental incapacity for which there is no reasonable accommodation, or other such adequate cause.

13. The Executive Committee of the Faculty Council, in consultation with the Provost and Executive Vice President for Academic Affairs, shall select five members of the tenured faculty to serve as the Faculty Hearing Committee. The Faculty Hearing Committee shall conduct hearings, make findings of fact, and make recommendations to appropriate university officers when a faculty member's employment is or may be suspended, transferred or terminated for any reason specified in Paragraph 12(c) above or Paragraph 14 below. When a faculty member seeks review for a reason listed under paragraph 14 below, the jurisdiction of the Faculty Hearing Committee shall be limited to whether the individual faculty member has been treated in a manner that is arbitrary or capricious and shall not extend to an inquiry in to the propriety of any action by the board of Trustees under paragraph 14(a) or (c) or of the president under paragraph 14(b). The methods of invoking jurisdiction of the Faculty Hearing Committee, the procedures to be employed by it, and additional regulation of its membership and responsibilities shall be established by resolution of the Faculty Council approved by the president of the university.

14. Nothing in the provisions set forth above shall be interpreted as restricting:

   (a) The right of the Board of Trustees under extraordinary circumstances to discontinue any academic program, department, or unit of the university.

   (b) The right of the President and the Provost and Executive Vice President for Academic Affairs, after conference with the appropriate Dean, and when appropriate, department chairs, to assign any faculty member to any appropriate position, provided no such assignment shall carry with it reduction in rank or change of status as to tenure.

15. It is the express desire and purpose of the President and the Board of Trustees to use the powers expressly reserved (Paragraph 14 above) only in cases of the utmost necessity, when failure to use such powers would adversely affect the interest of the university.

16. A faculty member on continuous appointment, whose appointment is terminated on the initiative of the university for reasons not involving moral delinquency, shall receive his or her salary for one year from the date of notification of termination, or until such time, within one year, as he or she may have entered into other employment, or commenced receipt of disability income insurance.

17. The provisions set forth above shall not apply to administrative offices. Appointment to, or retirement from, such offices shall not deprive faculty members of their tenure in the highest rank in which they have served prior to or during their service in administrative office.

Approved by BOT
May 2017

18. Promotion:  Promotion is based upon departmental needs and upon the faculty member's growth in professional competence and increased service to the university.  Recommendations for promotion are made by the dean of the school for college primarily concerned as provided in Paragraph 2 above.

19. Leaves of Absence:  Emory strongly encourages faculty members to take such leaves of absence as may benefit themselves and the university.  At intervals of at least six years of continuous service at Emory University, leaves of absence may be granted for a half year on full pay or for a year on half pay by the Dean of the academic unit.  Other leaves of absence may be granted on such terms as may appear justified in individual cases.

20. In conformity with paragraphs 2(a), 2(b), 3 and 8 of this "Statement of Principles Governing Faculty Relationships," the Dean and Faculty of each School and Division have established more detailed procedures for appointments, promotions and tenure.  Members of the faculty are urged to secure copies of such procedures to their appointments and become familiar with them.

21. *Definition of "year(s)" and "year(s) of service."*  Throughout the "Statement of Principles Governing Faculty Relationships," the terms "year(s)" and "year(s) of service" shall be construed based on the start date of employment as a faculty member at Emory.

## EMPLOYMENT AGREEMENT WITH THE EMORY CLINIC, INC.

THIS IS AN EMPLOYMENT AGREEMENT ("this Agreement") made and entered into on the **16th day of August, 2001** by and between **THE EMORY CLINIC, INC.**, a Georgia non-profit corporation (the "Clinic") and, **Kenneth J. Carney, MD, PharmD** ("Physician"), in which the parties hereto, in consideration of the mutual covenants and conditions contained in this document, the sufficiency of which is hereby acknowledged, do hereby agree as follows:

1.     Employment.  The Clinic hereby employs Physician as a physician in the practice of medicine, and Physician hereby accepts such employment, all upon the terms and conditions set forth in this Agreement.  Employment pursuant to this Agreement shall be at will and shall commence on **August 1, 2001.**

2.     Section.  Physician shall be a member of the Section of **Urology** (the "Section").

3.     Covenants of Physician.

(a)     Employment.  Physician agrees to devote all of Physician's professional working time and attention to the practice of medicine with the Clinic, except such time as is required to perform Physician's duties as a member of the faculty of the Emory University School of Medicine.  During Physician's employment with the Clinic, Physician shall not engage in any other employment involving the practice of medical services, without the written consent of the Chief Executive Officer.

(b)     Fees.  Physician agrees that all accounts receivable and fees for professional services rendered by Physician, including, without limitation, fees for providing testimony, opinion or review as an expert or fact witness and fees for consultative services to the Veterans Administration Hospital located in DeKalb County, Georgia, shall be the property of the Clinic except (1) fees collected through the Emory Medical Care Foundation, Inc. (which fees shall belong to such foundation), (2) salary received from Emory University or the Veterans Administration and (3) honoraria and other similar fees. Physician will turn over to the Clinic all fees collected from such professional services performed by Physician except those derived from services described in (1), (2) or (3) of the preceding sentence.  Physician must obtain the written approval of his Section Head prior to rendering any professional services outside of the Emory University System of Health Care affiliated institutions and prior to being engaged to provide any testimony, opinion or review as an expert or fact witness.

(c)     Supervision.  Physician agrees to be directly accountable to Physician's Section Head on all matters relating to Physician's employment hereunder.

4.     Insurance.  The Clinic shall carry, as an expense of the Clinic, professional liability insurance covering Physician in an amount approved by the Clinic annually.

Exhibit "C"

5.   Restrictive Covenants.  Physician expressly acknowledges that during the course of employment with the Clinic, Physician will be introduced to patients and referral sources of the Clinic who Physician would not otherwise have met except through employment under this Agreement.  Physician acknowledges that the restrictions imposed in this paragraph are essential for Physician to be offered employment by the Clinic. Physician further acknowledges that should employment be terminated for any reason, whether voluntarily or involuntarily, Physician would be in a position to cause irreparable harm to the Clinic unless Physician abides by the restrictions imposed herein.

(a)   Recruiting of Clinic Employees.  During Physician's employment with the Clinic, and for a period of two (2) years after the termination of such employment, for whatever reason, Physician shall not, personally, or on behalf of any other person, business, corporation or entity (other than on behalf of the Clinic or as specifically authorized by the Clinic), recruit or hire or attempt to recruit or hire or assist others in recruiting or hiring any employee of the Clinic who is a physician, nurse or other professional or technical employee with whom Physician had material contact in a professional capacity during the two years preceding the termination of Physician's employment with the Clinic.

(b)   Solicitation of Clinic Patients.  During Physician's employment with the Clinic, and for a period of two (2) years after the termination of Physician's employment with the Clinic, for whatever reason, Physician shall not personally, or on behalf of any other person, business, corporation or entity (other than on behalf of the Clinic or as specifically authorized by the Clinic) solicit any former or current patients of the Clinic, with whom Physician had material contact on behalf of the Clinic during the two (2) years preceding such termination of employment, for the purposes of providing medical care services.

(c)   Non-Compete Covenant.  During Physician's employment with the Clinic, and for a period of two (2) years after Physician resigns or terminates his employment with the Clinic, Physician shall not, personally or on behalf of any other person, business, corporation or entity (other than on behalf of the Clinic or as specifically authorized by the Clinic), engage in the practice of **Urology** within a *25 mile  radius of Grady Memorial Hospital, 80 Butler Street, Atlanta, GA  30303.*  The provisions contained in this paragraph 5(c) shall not become operative until ninety (90) days following the commencement date of employment contained in paragraph 1 above.

6.   Miscellaneous.

(a)   Notices.  All notices or other communications or deliveries provided for under this Agreement shall be in writing signed by the party making the same and shall be deemed to be given when delivered in person or on the third (3rd) business day after deposit in the United States mail, first-class postage prepaid, addressed to:

- 2 -

(i)   If to the Clinic:                     With a copy to:

The Emory Clinic, Inc.                Office of the General Counsel
1365 Clifton Road, N.E.               The Emory Clinic, Inc.
Atlanta, Georgia 30322                1365 Clifton Road NE
Attn: Clinic Director                 Building B, Suite 6431
                                      Atlanta, GA  30322

(ii)   If to Physician:

**Kenneth J. Carney, MD, PharmD**
**Department of Urology**

or to such other persons or at such different addresses as may be specified in writing, given by one party to the other in accordance with the foregoing.

(b)   <u>Medical Records of the Clinic</u>.  If Physician ceases to be employed by the Clinic for any reason, Physician shall have no right to charts or records of patients treated by Physician, but all such charts and records shall remain the property of the Clinic.

(c)   <u>Applicable Law</u>.  This Agreement shall be subject to, governed by and construed in accordance with the laws of the State of Georgia.

7.   <u>Termination by University</u>.  If not sooner terminated, this Agreement will terminate on the date the Physician ceases to be a member of the regular full-time faculty of the Emory University School of Medicine or accepts Emeritus status.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed, under seal, as of the day and year first above written.

THE EMORY CLINIC, INC.                PHYSICIAN

By: _____         _____
**Rein Saral, M.D.**                  **Kenneth J. Carney, MD, PharmD**
**Chief Executive Officer**

- 3 -

**From:** Rogers, Thomas <tomrogers@emory.edu>
**Sent:** Friday, June 25, 2021 10:58 AM
**To:** Sukhatme, Vikas <vsukhatme@emory.edu>
**Cc:** Carney, Jeff <kjcarne@emory.edu>; Wakefield, Peter W <pwakefi@emory.edu>; McAfee, Noelle C <noelle.c.mcafee@emory.edu>
**Subject:** Dr. K. Jeff Carney contract

June 25, 2021

Dean Vikas P. Sukhatme, Woodruff Professor
Emory School of Medicine

Dear Dean Sukhatme,

Dr. K. Jeff Carney contacted the Emory chapter of the American Association of University Professors (AAUP) to inform us that his contract with the School of Medicine had not been renewed effective August 31, after nearly 20 years of full-time service at Emory. We, the executive committee of the AAUP chapter, request that Dr. Carney be afforded a hearing before an elected faculty committee. We do not write to comment on the merits of the reasons presented to Dr. Carney, but to insist on adherence to the core principles of academic freedom, due process, and shared governance that the AAUP defends.

The chapter's interest in Dr. Carney's case stems from the AAUP's longstanding commitment to academic freedom and tenure, the basic tenets of which are set forth in the _1940 Statement of Principles on Academic Freedom and Tenure_. The Association holds that long-serving full-time faculty members should enjoy the stability that tenure brings, even if their "track" or job title does not explicitly grant them that status. Regulation 1b of the Association's _Recommended Institutional Regulations on Academic Freedom and Tenure_ provides that, "With the exception of special appointments clearly limited to a brief association with the institution . . . all full-time appointments are of two kinds: (1) probationary appointments; (2) appointments with continuous tenure." The 1940 _Statement of Principles_ calls for a maximum period of probation not to exceed seven years of full-time faculty service, a principle reinforced in the Association's report on_Contingent Appointments and the Academic Profession_.

The authors and endorsers of the AAUP _Statement_ consider continuance of full-time service beyond the maximum probationary period as entitling faculty members who so serve to the procedural protections that accrue with tenure, whether or not there has been specific action by the college or university concerned to grant tenure in a particular case. The report on continent appointments clearly states that "those who are reappointed beyond seven years should be recognized as having the protections that would accrue with tenure—termination only for adequate cause and with due process." Clearly, the principle applies to Dr. Carney, who has served as a full-time faculty member at Emory for nearly 20 years. After such a protracted period, Dr. Carney appears to have long since attained the protections of tenure through the length of his service.

Regarding due process, the 1940 _Statement_ states: "Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution." The AAUP's _Statement on Government of Colleges and Universities_ asserts straightforwardly that "Faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal." This means that faculty must play a role in the weightiest decisions of university life, including contract renewals.

We hope the School of Medicine will adhere to best practices in granting Dr. Carney a hearing before faculty to consider the reasons for his non-renewal and to present his perspective.

Thank you for your attention.

Exhibit "D"

Thomas D. Rogers

Associate Professor of History
President, Emory AAUP

Peter Wakefield
Professor of Pedagogy, Institute for the Liberal Arts
Vice President, Emory AAUP

Noëlle McAfee
Professor of Philosophy, Secondary Appointment as Professor of Psychiatry and Behavioral Sciences
At-large officer, Emory AAUP

---

This e-mail message (including any attachments) is for the sole use of
the intended recipient(s) and may contain confidential and privileged
information. If the reader of this message is not the intended
recipient, you are hereby notified that any dissemination, distribution
or copying of this message (including any attachments) is strictly
prohibited.

If you have received this message in error, please contact
the sender by reply e-mail message and destroy all copies of the
original message (including attachments).



AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

1133 19th Street, NW, Suite 200, Washington, DC 20036
**PHONE:** 202.737.5900 • **FAX:** 202.737.5526 • **www.aaup.org**

June 29, 2021

<u>VIA ELECTRONIC MAIL</u>

Dr. Gregory L. Fenves
President
505 Kilgo Circle
Atlanta, Georgia 30322

Dear President Fenves:

Dr. Kenneth Jeff Carney, an untenured associate professor of urology in the School of
Medicine at Emory University, has sought the advice and assistance of the American
Association of University Professors as a result of a May 26, 2021, letter from
department chair Martin Sanda and associate dean Ira Horowitz informing him that his
appointment would not be renewed effective August 31, 2021. The basis for the action
was allegedly his refusal to accept training "to address issues of navigating conflict,
leadership and responding appropriately to feedback." We understand that Dr. Carney has
sharply denied these allegations.

The Association's interest in Dr. Carney's case stems from our longstanding commitment
to principles of academic freedom and due process, the basic tenets of which are set forth
in the enclosed 1940 *Statement of Principles on Academic Freedom and Tenure*. As you
may know, the 1940 *Statement* was issued jointly by the AAUP and the Association of
American Colleges and Universities. It has received the endorsement of more than 250
professional organizations and learned societies. We are pleased to note the prominent
incorporation of the 1940 *Statement* in the university's *Statement of Principles Governing
Faculty Relationships* ("Gray Book") and the decision of the Emory board of trustees to
"accept the general principles and purposes embodied in" the 1940 *Statement*. Derivative
procedural standards applicable to Dr. Carney's case are set forth in the AAUP's
*Recommended Institutional Regulations on Academic Freedom and Tenure* (also
enclosed).

With regard to the dismissal process, the general academic community recognizes that
the dismissal for cause of a faculty member on continuous appointment, or with a special
or probationary appointment before the end of a specified term should occur only after
the affordance of requisite safeguards of academic due process. The following specific
procedures are among those set forth in Regulation 5 of the *Recommended Institutional
Regulations*: "a statement of charges, framed with reasonable particularity by the
president or the president's delegate"; a formal hearing of record on the charges,
conducted by an elected faculty body; the faculty member's right to have legal counsel;
the faculty member's right to have evidence introduced at the hearing and placed in the

Exhibit "E"

President Fenves
June 29, 2021
Page 2

record; the administration's bearing the burden of demonstrating adequate cause for dismissal through clear and convincing evidence in the record considered as a whole; opportunity for the affected faculty member to cross-examine witnesses.

We appreciate that the administration's action was in the form of nonrenewal of a contract. Even were we to accept that the action is properly characterized as a nonreappointment of a faculty member on renewable annual contracts rather than a dismissal for cause, there is the issue of protections for non-tenured faculty members. The Association's enclosed *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments* calls for, in the event of a decision not to renew an appointment, the faculty member upon request to be advised of the reasons which contributed to that decision, and also upon request to have the reasons confirmed in writing. The *Statement* further provides that there be opportunity for appeal of a decision against reappointment when it is requested.

We are also concerned with regard to the case of Dr. Carney, who states that he was in his twentieth year of full-time service on the faculty of Emory University, with the adequacy of notification provided him. Notice was issued to Dr. Carney on May 26 effective August 31. Even assuming again that the action against Dr. Carney can be accurately described as the nonreappointment, rather than the dismissal, of a faculty member, Association-supported standards call for the provision of at least a year of notice after two or more years of service at the institution. In this regard, note Regulation 2 (c) of the *Recommended Institutional Regulations*.

We recognize that the information on which this letter is based has been provided to us exclusively by Dr. Carney. We would therefore welcome your comments. If, however, the facts recounted above are essentially accurate, we recommend that the notice of May 26 be withdrawn and that future action regarding Dr. Carney, if any is to be taken, be consistent with the principles and standards referenced above.

We look forward to your response.

Sincerely,

Anita Levy, Ph.D.
Associate Secretary

Enclosures

cc:   Mr. Robert Goddard, Chair, Board of Trustees
      Mr. Stephen D. Sencer, Chief Legal Officer

President Fenves
June 29, 2021
Page 3

  Dr. Vikas Sukhatme, Dean, Emory University School of Medicine
  Dr. Ira Horowitz, Associate Dean, Emory University School of Medicine
  Dr. Martin Sanda, Chair, Department of Urology, Emory University School of
   Medicine
  Professor Thomas D. Rogers, President, Emory University AAUP Chapter
  Professor Peter Wakefield, Vice President, Emory University AAUP Chapter
  Professor Matthew Boedy, President, AAUP Georgia Conference
  Dr. Kenneth Jeff Carney

# 1940 Statement of Principles on Academic Freedom and Tenure

## with 1970 Interpretive Comments

In 1915 the Committee on Academic Freedom and Academic Tenure of the American Association of University Professors formulated a statement of principles on academic freedom and academic tenure known as the 1915 *Declaration of Principles,* which was officially endorsed by the Association at its Second Annual Meeting held in Washington, D.C., December 31, 1915, and January 1, 1916.

In 1925 the American Council on Education called a conference of representatives of a number of its constituent members, among them the American Association of University Professors, for the purpose of formulating a shorter statement of principles on academic freedom and tenure. The statement formulated at this conference, known as the 1925 *Conference Statement on Academic Freedom and Tenure,* was endorsed by the Association of American Colleges (now the Association of American Colleges and Universities) in 1925 and by the American Association of University Professors in 1926.

In 1940, following a series of joint conferences begun in 1934, representatives of the American Association of University Professors and of the Association of American Colleges agreed on a restatement of the principles that had been set forth in the 1925 *Conference Statement on Academic Freedom and Tenure.* This restatement is known to the profession as the 1940 *Statement of Principles on Academic Freedom and Tenure.*

Following extensive discussions on the 1940 *Statement of Principles on Academic Freedom and Tenure* with leading educational associations and with individual faculty members and administrators, a joint committee of the AAUP and the Association of American Colleges met during 1969 to reevaluate this key policy statement. On the basis of the comments received, and the discussions that ensued, the joint committee felt the preferable approach was to formulate interpretations of the 1940 *Statement* from the experience gained in implementing and applying it for over thirty years and of adapting it to current needs.

The committee submitted to the two associations for their consideration *Interpretive Comments* that are included below as footnotes to the 1940 *Statement.*[1] These interpretations were adopted by the Council of the American Association of University Professors in April 1970 and endorsed by the Fifty-Sixth Annual Meeting as Association policy.

1. The Introduction to the Interpretive Comments notes: In the thirty years since their promulgation, the principles of the 1940 "Statement of Principles on Academic Freedom and Tenure" have undergone a substantial amount of refinement. This has evolved through a variety of processes, including customary acceptance, understandings mutually arrived at between institutions and professors or their representatives, investigations and reports by the American Association of University Professors, and formulations of statements by that association either alone or in conjunction with the Association of American

The purpose of this statement is to promote public understanding and support of academic freedom and tenure and agreement upon procedures to ensure them in colleges and universities. Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole.[2] The common good depends upon the free search for truth and its free exposition.

Academic freedom is essential to these purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of truth. Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.[3]

Tenure is a means to certain ends; specifically: (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession

attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society.

## Academic Freedom

1. Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

2. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.[4] Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.[5]

3. College and university teachers are citizens, members of a learned profession, and officers of an educational institution. When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.[6]

Colleges. These comments represent the attempt of the two associations, as the original sponsors of the 1940 "Statement," to formulate the most important of these refinements. Their incorporation here as Interpretive Comments is based upon the premise that the 1940 "Statement" is not a static code but a fundamental document designed to set a framework of norms to guide adaptations to changing times and circumstances.

Also, there have been relevant developments in the law itself reflecting a growing insistence by the courts on due process within the academic community which parallels the essential concepts of the 1940 "Statement"; particularly relevant is the identification by the Supreme Court of academic freedom as a right protected by the First Amendment. As the Supreme Court said in *Keyishian v. Board of Regents*, 385 US 589 (1967), "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."

2. The word "teacher" as used in this document is understood to include the investigator who is attached to an academic institution without teaching duties.

3. First 1970 comment: The Association of American Colleges and the American Association of University Professors have long recognized that membership in the academic profession carries with it special responsibilities. Both associations either separately or jointly have consistently affirmed these responsibilities in major policy statements, providing guidance to professors in their utterances as citizens, in the exercise of their responsibilities to the institution and to students, and in their conduct when resigning from their institution or when undertaking government-sponsored research. Of particular relevance is the "Statement on Professional Ethics" adopted in 1966 as Association policy (AAUP, *Policy Documents and Reports*, 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 145–46).

4. Second 1970 comment: The intent of this statement is not to discourage what is "controversial." Controversy is at the heart of the free academic inquiry which the entire statement is designed to foster. The passage serves to underscore the need for teachers to avoid persistently intruding material which has no relation to their subject.

5. Third 1970 comment: Most church-related institutions no longer need or desire the departure from the principle of academic freedom implied in the 1940 "Statement," and we do not now endorse such a departure.

6. Fourth 1970 comment: This paragraph is the subject of an interpretation adopted by the sponsors of the 1940 "Statement" immediately following its endorsement:

If the administration of a college or university feels that a teacher has not observed the admonitions of paragraph 3 of the section on Academic Freedom and believes that the extramural utterances of the teacher have been such as to raise grave doubts concerning the teacher's fitness for his or her position, it may proceed to file charges under paragraph 4 of the section on Academic Tenure. In pressing such charges, the administration should remember that teachers are citizens and should be

## Academic Tenure

After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

In the interpretation of this principle it is understood that the following represents acceptable academic practice:

1. The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.
2. Beginning with appointment to the rank of full-time instructor or a higher rank,[7] the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the proviso that when, after a term of probationary service of more than three years in one or more institutions, a teacher is called to another institution, it may be agreed in writing that the new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years.[8] Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.[9]

---

accorded the freedom of citizens. In such cases the administration must assume full responsibility, and the American Association of University Professors and the Association of American Colleges are free to make an investigation.

Paragraph 3 of the section on Academic Freedom in the 1940 "Statement" should also be interpreted in keeping with the 1964 "Committee A Statement on Extramural Utterances," *Policy Documents and Reports*, 31, which states inter alia: "The controlling principle is that a faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty member's unfitness for his or her position. Extramural utterances rarely bear upon the faculty member's fitness for the position. Moreover, a final decision should take into account the faculty member's entire record as a teacher and scholar."

Paragraph 5 of the "Statement on Professional Ethics," *Policy Documents and Reports*, 146, also addresses the nature of the "special obligations" of the teacher:

> As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

Both the protection of academic freedom and the requirements of academic responsibility apply not only to the full-time probationary and the tenured teacher, but also to all others, such as part-time faculty and teaching assistants, who exercise teaching responsibilities.

7. Fifth 1970 comment: The concept of "rank of full-time instructor or a higher rank" is intended to include any person who teaches a full-time load regardless of the teacher's specific title. [For a discussion of this question, see the "Report of the Special Committee on Academic Personnel Ineligible for Tenure," *AAUP Bulletin* 52 (September 1966): 280–82.]

8. Sixth 1970 comment: In calling for an agreement "in writing" on the amount of credit given for a faculty member's prior service at other institutions, the "Statement" furthers the general policy of full understanding by the professor of the terms and conditions of the appointment. It does not necessarily follow that a professor's tenure rights have been violated because of the absence of a written agreement on this matter. Nonetheless, especially because of the variation in permissible institutional practices, a written understanding concerning these matters at the time of appointment is particularly appropriate and advantageous to both the individual and the institution. [For a more detailed statement on this question, see "On Crediting Prior Service Elsewhere as Part of the Probationary Period," *Policy Documents and Reports*, 167–68.]

9. Seventh 1970 comment: The effect of this subparagraph is that a decision on tenure, favorable or unfavorable, must be made at least twelve months prior to the completion of the probationary period. If the decision is negative, the appointment for the following year becomes a terminal one. If the decision is affirmative, the provisions in the 1940 "Statement" with respect to the termination of service of teachers or investigators after the expiration of a probationary period should apply from the date when the favorable decision is made.

The general principle of notice contained in this paragraph is developed with greater specificity in the "Standards for Notice of Nonreappointment," endorsed by the Fiftieth Annual Meeting of the American Association of University Professors (1964) (*Policy Documents and Reports*, 99). These standards are:

> Notice of nonreappointment, or of intention not to recommend reappointment to the governing board, should be given in writing in accordance with the following standards:
> 1. *Not later than March 1 of the first academic year of service*, if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination.

3. During the probationary period a teacher should have the academic freedom that all other members of the faculty have.[10]

4. Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should be informed before the hearing in writing of the charges and should have the opportunity to be heard in his or her own defense by all bodies that pass judgment upon the case. The teacher should be permitted to be accompanied by an advisor of his or her own choosing who may act as counsel. There should be a full stenographic record of the hearing available to the parties concerned. In the hearing of charges of incompetence the testimony should include that of teachers and other scholars, either from the teacher's own or from other institutions. Teachers on continuous appointment who are dismissed for reasons not involving moral turpitude should receive their salaries for at least a year from the date of notification of dismissal whether or not they are continued in their duties at the institution.[11]

---

2. *Not later than December 15 of the second academic year of service,* if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination.

3. At least twelve months before the expiration of an appointment after two or more years in the institution.

Other obligations, both of institutions and of individuals, are described in the "Statement on Recruitment and Resignation of Faculty Members," *Policy Documents and Reports,* 153–54, as endorsed by the Association of American Colleges and the American Association of University Professors in 1961.

10. Eighth 1970 comment: The freedom of probationary teachers is enhanced by the establishment of a regular procedure for the periodic evaluation and assessment of the teacher's academic performance during probationary status. Provision should be made for regularized procedures for the consideration of complaints by probationary teachers that their academic freedom has been violated. One suggested procedure to serve these purposes is contained in the "Recommended Institutional Regulations on Academic Freedom and Tenure," *Policy Documents and Reports,* 79–90, prepared by the American Association of University Professors.

11. Ninth 1970 comment: A further specification of the academic due process to which the teacher is entitled under this paragraph is contained in the "Statement on Procedural Standards in Faculty Dismissal Proceedings," *Policy Documents and Reports,* 91–93, jointly approved by the

5. Termination of a continuous appointment because of financial exigency should be demonstrably bona fide.

## Endorsers

Note: Groups that changed names subsequent to endorsing the statement are listed under their current names.

Association of American Colleges and
 Universities ................................................1941
American Association of University
 Professors......................................................1941
American Library Association (adapted for
 librarians)......................................................1946
Association of American Law Schools.............1946
American Political Science Association ..........1947
American Association for Higher
 Education and Accreditation.......................1950
American Association of Colleges for
 Teacher Education.........................................1950
Eastern Psychological Association ...................1950
Southern Society for Philosophy and
 Psychology ....................................................1953
American Psychological Association ...............1961
American Historical Association......................1961
Modern Language Association.........................1962
American Economic Association......................1962
Agricultural and Applied Economic
 Association.....................................................1962
Midwest Sociological Society ..........................1963
Organization of American Historians.............1963
Society for Classical Studies............................1963
American Council of Learned Societies..........1963
American Sociological Association ..................1963

---

American Association of University Professors and the Association of American Colleges in 1958. This interpretive document deals with the issue of suspension, about which the 1940 "Statement" is silent.

The "Statement on Procedural Standards in Faculty Dismissal Proceedings" provides: "Suspension of the faculty member during the proceedings is justified only if immediate harm to the faculty member or others is threatened by the faculty member's continuance. Unless legal considerations forbid, any such suspension should be with pay." A suspension which is not followed by either reinstatement or the opportunity for a hearing is in effect a summary dismissal in violation of academic due process.

The concept of "moral turpitude" identifies the exceptional case in which the professor may be denied a year's teaching or pay in whole or in part. The statement applies to that kind of behavior which goes beyond simply warranting discharge and is so utterly blameworthy as to make it inappropriate to require the offering of a year's teaching or pay. The standard is not that the moral sensibilities of persons in the particular community have been affronted. The standard is behavior that would evoke condemnation by the academic community generally.

Southern Historical Association ......................1963
American Studies Association .........................1963
Association of American Geographers ............1963
Southern Economic Association ......................1963
Classical Association of the Middle West
    and South......................................................1964
Southwestern Social Science Association........1964
Archaeological Institute of America ...............1964
Southern Management Association.................1964
American Theatre Association
    (now dissolved) ...........................................1964
South Central Modern Language
    Association....................................................1964
Southwestern Philosophical Society...............1964
Council of Independent Colleges.....................1965
Mathematical Association of America.............1965
Arizona-Nevada Academy of Science .............1965
American Risk and Insurance Association ......1965
Academy of Management ..................................1965
American Catholic Historical Association.......1966
American Catholic Philosophical
    Association.................................................... 1966
Association for Education in Journalism
    and Mass Communication.........................1966
Western History Association ...........................1966
Mountain-Plains Philosophical Conference ...1966
Society of American Archivists .......................1966
Southeastern Psychological Association..........1966
Southern States Communication
    Association....................................................1966
American Mathematical Society......................1967
Association for Slavic, East European,
    and Eurasian Studies...................................1967
College Theology Society .................................1967
Council on Social Work Education..................1967
American Association of Colleges of
    Pharmacy......................................................1967
American Academy of Religion ......................1967
Association for the Sociology of Religion .......1967
American Society of Journalism School
    Administrators (now merged with the
    Association of Schools of Journalism
    and Mass Communication).........................1967
John Dewey Society .........................................1967
South Atlantic Modern Language
    Association....................................................1967
American Finance Association ........................1967
Association for Social Economics ...................1967
Phi Beta Kappa Society ...................................1968
Society of Christian Ethics ..............................1968
American Association of Teachers
    of French ......................................................1968
Eastern Finance Association ...........................1968
American Association for Chinese Studies ......1968
American Society of Plant Biologists..............1968
University Film and Video Association ..........1968
American Dialect Society .................................1968

American Speech-Language-Hearing
    Association....................................................1968
Association of Social and Behavioral
    Scientists ......................................................1968
College English Association..............................1968
National College Physical Education
    Association for Men .....................................1969
American Real Estate and Urban Economics
    Association....................................................1969
Council for Philosophical Studies ..................1969
History of Education Society............................1969
American Musicological Society .....................1969
American Association of Teachers of
    Spanish and Portuguese..............................1969
Texas Community College Teachers
    Association....................................................1970
College Art Association of America................1970
Society of Professors of Education .................1970
American Anthropological Association..........1970
Association of Theological Schools ................1970
Association of Schools of Journalism and
    Mass Communication ..................................1971
Academy of Legal Studies in Business.............1971
Americans for the Arts ....................................1972
New York State Mathematics Association
    of Two-Year Colleges...................................1972
College Language Association ..........................1973
Pennsylvania Historical Association...............1973
American Philosophical Association................1974
American Classical League ..............................1974
American Comparative Literature
    Association....................................................1974
Rocky Mountain Modern Language
    Association....................................................1974
Society of Architectural Historians................1975
American Statistical Association.....................1975
American Folklore Society ..............................1975
Association for Asian Studies .........................1975
Linguistic Society of America .........................1975
African Studies Association ............................1975
American Institute of Biological Sciences ......1975
North American Conference on British
    Studies..........................................................1975
Sixteenth-Century Society and Conference ...1975
Texas Association of College Teachers............1976
Association for Jewish Studies .......................1976
Association for Spanish and Portuguese
    Historical Studies........................................1976
Western States Communication Association.....1976
Texas Association of Colleges for Teacher
    Education......................................................1977
Metaphysical Society of America....................1977
American Chemical Society .............................1977
Texas Library Association................................1977
American Society for Legal History................1977
Iowa Higher Education Association ................1977
American Physical Therapy Association .........1979

North Central Sociological Association ........... 1980
Dante Society of America ................................. 1980
Association for Communication
    Administration ............................................. 1981
National Communication Association ............. 1981
American Association of Physics Teachers ...... 1982
Middle East Studies Association ..................... 1982
National Education Association ....................... 1985
American Institute of Chemists ...................... 1985
American Association of Teachers
    of German .................................................... 1985
American Association of Teachers of Italian ... 1985
American Association for Applied
    Linguistics ................................................... 1986
American Association for Cancer Education ... 1986
American Society of Church History ............. 1986
Oral History Association ................................. 1987
Society for French Historical Studies ............. 1987
History of Science Society ............................. 1987
American Association of Pharmaceutical
    Scientists ..................................................... 1988
American Association for Clinical
    Chemistry .................................................... 1988
Council for Chemical Research ....................... 1988
Association for the Study of Higher
    Education ..................................................... 1988
American Psychological Association .............. 1989
Association for Psychological Science ............ 1989
University and College Labor Education
    Association ................................................... 1989
Society for Neuroscience ................................ 1989
Renaissance Society of America ..................... 1989
Society of Biblical Literature .......................... 1989
National Science Teachers Association ........... 1989
Medieval Academy of America ...................... 1990
American Society of Agronomy ..................... 1990
Crop Science Society of America ................... 1990
Soil Science Society of America ..................... 1990
International Society of Protistologists .......... 1990
Society for Ethnomusicology .......................... 1990
American Association of Physicists
    in Medicine ................................................. 1990
Animal Behavior Society ................................ 1990
Illinois Community College Faculty
    Association ................................................... 1990
American Society for Theatre Research .......... 1990
National Council of Teachers of English ......... 1991
Latin American Studies Association ............... 1992
Society for Cinema and Media Studies ........... 1992
American Society for Eighteenth-Century
    Studies ......................................................... 1992
Council of Colleges of Arts and Sciences ........ 1992
American Society for Aesthetics .................... 1992
Association for the Advancement
    of Baltic Studies .......................................... 1994
American Council of Teachers of Russian ....... 1994

Council of Teachers of Southeast
    Asian Languages .......................................... 1994
American Association of Teachers of Arabic ... 1994
American Association of Teachers of
    Japanese ...................................................... 1994
Academic Senate for California
    Community Colleges .................................... 1996
National Council for the Social Studies .......... 1996
Council of Academic Programs in
    Communication Sciences and Disorders .... 1996
Association for Women in Mathematics ......... 1997
Philosophy of Time Society ............................ 1998
World Communication Association ................ 1999
The Historical Society .................................... 1999
Association for Theatre in Higher Education .. 1999
National Association for Ethnic Studies ......... 1999
Association of Ancient Historians ................... 1999
American Culture Association ......................... 1999
American Conference for Irish Studies .......... 1999
Society for Philosophy in the
    Contemporary World ................................... 1999
Eastern Communication Association .............. 1999
Association for Canadian Studies
    in the United States ...................................... 1999
American Association for the History of
    Medicine ..................................................... 2000
Missouri Association of Faculty Senates ........ 2000
Association for Symbolic Logic ...................... 2000
American Society of Criminology ................... 2001
American Jewish Historical Society ............... 2001
New England Historical Association ............... 2001
Society for the Scientific Study of Religion .... 2001
Society for German-American Studies .......... 2001
Society for Historians of the Gilded Age
    and Progressive Era ...................................... 2001
Eastern Sociological Society ........................... 2001
Chinese Historians in the United States ......... 2001
Community College Humanities
    Association ................................................... 2002
Immigration and Ethnic History Society ........ 2002
Society for Early Modern Catholic Studies .... 2002
Academic Senate of the California State
    University .................................................... 2004
Agricultural History Society .......................... 2004
National Council for Accreditation
    of Teacher Education ................................... 2005
American Council on the Teaching
    of Foreign Languages ................................... 2005
Society for the Study of Social Biology .......... 2005
Society for the Study of Social Problems ....... 2005
Association of Black Sociologists .................... 2005
Dictionary Society of North America ............. 2005
Society for Buddhist-Christian Studies .......... 2005
Society for Armenian Studies ......................... 2006
Society for the Advancement of
    Scandinavian Study ..................................... 2006

18

American Physiological Society ...................... 2006
National Women's Studies Association .......... 2006
National Coalition for History ....................... 2006
Society for Military History ........................... 2006
Society for Industrial and Applied
    Mathematics ................................................ 2006
Association for Research on Ethnicity and
    Nationalism in the Americas .................... 2006
Society of Dance History Scholars................. 2006
Association of Literary Scholars, Critics,
    and Writers ................................................. 2006
National Council on Public History............... 2006
College Forum of the National Council of
    Teachers of English .................................... 2006
Society for Music Theory ............................... 2006
Society for Historians of American
    Foreign Relations....................................... 2006
Law and Society Association ........................... 2006
Society for Applied Anthropology................. 2006
American Society of Plant Taxonomists........ 2006
Society for the History of Technology .......... 2006
German Studies Association............................ 2006
Association of College and Research
    Libraries ......................................................2007
Czechoslovak Studies Association...................2007
American Educational Studies Association .....2007
Southeastern Women's Studies Association .. 2009
American Academy for Jewish Research.........2014
American Association for Ukrainian
    Studies..........................................................2014
American Association of Italian Studies .........2014
American Theatre and Drama Society ...........2014
Central European History Society...................2014
Central States Communication Association....2014

Chinese Language Teachers Association .........2014
Coordinating Council for Women
    in History......................................................2014
Ecological Society of America .........................2014
Institute for American Religious and
    Philosophical Thought................................2014
Italian American Studies Association..............2014
Midwestern Psychological Association............2014
Modern Greek Studies Association..................2014
National Association of Professors
    of Hebrew.....................................................2014
National Council of Less Commonly
    Taught Languages ........................................2014
Population Association of America ..................2014
Society for Italian Historical Studies..............2014
Society for Psychophysiological Research .......2014
Society for Romanian Studies..........................2014
Society for Textual Scholarship.......................2014
Society for the History of Children and
    Youth.............................................................2014
Society for the Psychological Study
    of Social Issues.............................................2014
Society for the Study of the Multi-Ethnic
    Literature of the United States...................2014
Society of Civil War Historians.......................2014
Society of Mathematical Psychology...............2014
Sociologists for Women in Society ..................2014
Urban History Association ...............................2014
World History Association ...............................2014
American Educational Research
    Association....................................................2014
Labor and Working-Class History
    Association....................................................2014
Paleontological Society .....................................2014

19

# Recommended Institutional Regulations on Academic Freedom and Tenure

### (2018 REVISION)

*The* Recommended Institutional Regulations on Academic Freedom and Tenure *sets forth, in language suitable for use by an institution of higher education, rules that derive from the chief provisions and interpretations of the 1940* Statement of Principles on Academic Freedom and Tenure *and of the* Statement on Procedural Standards in Faculty Dismissal Proceedings. *The* Recommended Institutional Regulations *was first formulated by Committee A on Academic Freedom and Tenure in 1957. A revised and expanded text, approved by Committee A in 1968, reflected the development of Association standards and procedures. Texts with further revisions were approved by Committee A in 1972, 1976, 1982, 1990, 1999, 2005, 2006, 2009, 2013, and 2018. When such revisions have constituted a change in the Association's policies, they have been adopted by the Council.*

*The current text is based upon the Association's continuing experience in evaluating regulations actually in force at particular institutions. It is also based upon further definition of the standards and procedures of the Association over the years. The Association will be glad to assist in interpretation of the regulations or to consult about their incorporation in, or adaptation to, the rules of a particular college or university.*

**Foreword**

These regulations are designed to enable the [named institution] to protect academic freedom and tenure and to ensure academic due process. The principles implicit in these regulations are for the benefit of all who are involved with or are affected by the policies and programs of the institution. A college or university is a marketplace of ideas, and it cannot fulfill its purposes of transmitting, evaluating, and extending knowledge if it requires conformity with any orthodoxy of content and method. In the words of the United States Supreme Court, "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

## 1. STATEMENT OF TERMS OF APPOINTMENT

a. The terms and conditions of every appointment to the faculty will be stated or confirmed in writing, and a copy of the appointment document will be supplied to the faculty member. Any subsequent extensions or modifications of an appointment, and any special understandings or any notices incumbent upon either party to provide, will be stated or confirmed in writing, and a copy will be given to the faculty member.

b. With the exception of special appointments clearly limited to a brief association with the institution, and reappointments of retired faculty members on special conditions, all full-time faculty appointments are of two kinds: (1) probationary appointments; (2) appointments with continuous tenure. All part-time faculty appointments are either (1) probationary appointments; (2) appointments with continuous tenure; or (3) other nontenured appointments.

c. Except for faculty members who have tenure status, every person with a teaching or research appointment of any kind will be informed each

*Recommended Institutional Regulations on Academic Freedom and Tenure*

year in writing of the renewal of the appointment and of all matters relative to eligibility for the acquisition of tenure.

## 2. Probationary Appointments

a. Probationary appointments may be for one year, or for other stated periods, subject to renewal. The total period of full-time service prior to the acquisition of continuous tenure will not exceed _____ years,[1] including all previous full-time service with the rank of instructor or higher in other institutions of higher learning, except that the probationary period may extend to as much as four years, even if the total full-time service in the profession thereby exceeds seven years; the terms of such extension will be stated in writing at the time of initial appointment.[2] Scholarly leave of absence for one year or less will count as part of the probationary period as if it were prior service at another institution, unless the individual and the institution agree in writing to an exception to this provision at the time the leave is granted.

b. The faculty member will be advised, at the time of initial appointment, of the substantive standards and procedures generally employed in decisions affecting renewal and tenure. Any special standards adopted by the faculty member's department or school will also be transmitted. The faculty member will be advised of the time when decisions affecting renewal or tenure are ordinarily made and will be given the opportunity to submit material believed to be helpful to an adequate consideration of the faculty member's circumstances.

c. Regardless of the stated term or other provisions of any appointments, written notice that a probationary appointment is not to be renewed will be given to the faculty member in advance of the expiration of the appointment as follows: (1) not later than March 1 of the first academic year of service if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination; (2) not later than December 15 of the second academic year of service if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic

year, at least six months in advance of its termination; (3) at least twelve months before the expiration of an appointment after two or more years of service at the institution.

d. The institution will normally notify faculty members whose appointments are being renewed of the terms and conditions of their renewals by March 15, but in no case will such information be given later than _____.[3]

e. When a decision not to renew an appointment has been reached, the faculty member involved will be informed of that decision in writing by the body or individual making the decision; the faculty member will be advised upon request of the reasons which contributed to that decision. The faculty member may request a reconsideration by the body or individual making the decision.

f. If the faculty member so requests, the reasons given in explanation of the nonrenewal will be confirmed in writing.

g. Insofar as the faculty member alleges that the decision against renewal was based on inadequate consideration, the committee[4] that reviews the faculty member's allegation will determine whether the decision was the result of adequate consideration in terms of the relevant standards of the institution. The review committee will not substitute its judgment on the merits for that of the body or individual that made the decision. If the review committee believes that adequate consideration was not given to the faculty member's qualifications, it will recommend reconsideration by the body or individual that made the decision, indicating the respects in which it believes the consideration may have been inadequate. It will provide copies of its findings to the faculty member, the body or individual that made the decision, and the president or other appropriate administrative officer.

## 3. Termination of Appointment by Faculty Members

Faculty members may terminate their appointments effective at the end of an academic year, provided that they give notice in writing at the earliest possible opportunity, but not later than May 15, or thirty days after receiving notification of the terms of appointment for the coming year, whichever date occurs later.

*Recommended Institutional Regulations on Academic Freedom and Tenure*

Faculty members may properly request a waiver of this requirement of notice in case of hardship or in a situation where they would otherwise be denied substantial professional advancement or other opportunity.

## 4. TERMINATION OF APPOINTMENTS BY THE INSTITUTION

a. Termination of an appointment with continuous tenure, or of a probationary or other nontenured appointment before the end of the specified term, may be effected by the institution only for adequate cause.

b. If termination takes the form of a dismissal for cause, it will be pursuant to the provisions specified in Regulation 5.

### Financial Exigency[5]

c. (1) Termination of an appointment with continuous tenure, or of a probationary or other nontenured appointment before the end of the specified term, may occur under extraordinary circumstances because of a demonstrably bona fide financial exigency, i.e., a severe financial crisis that fundamentally compromises the academic integrity of the institution as a whole and that cannot be alleviated by less drastic means.

[Note: Each institution in adopting regulations on financial exigency will need to decide how to share and allocate the hard judgments and decisions that are necessary in such a crisis.

As a first step, there should be an elected faculty governance body, or a body designated by a collective bargaining agreement, that participates in the decision that a condition of financial exigency exists or is imminent and that all feasible alternatives to termination of appointments have been pursued, including expenditure of one-time money or reserves as bridge funding, furloughs, pay cuts, deferred-compensation plans, early-retirement packages, deferral of nonessential capital expenditures, and cuts to noneducational programs and services, including expenses for administration.[6]

Judgments determining where within the overall academic program termina-

tion of appointments may occur involve considerations of educational policy, including affirmative action, as well as of faculty status, and should therefore be the primary responsibility of the faculty or of an appropriate faculty body.[7] The faculty or an appropriate faculty body should also exercise primary responsibility in determining the criteria for identifying the individuals whose appointments are to be terminated. These criteria may appropriately include considerations of length of service.

The responsibility for identifying individuals whose appointments are to be terminated should be committed to a person or group designated or approved by the faculty. The allocation of this responsibility may vary according to the size and character of the institution, the extent of the terminations to be made, or other considerations of fairness in judgment. The case of a faculty member given notice of proposed termination of appointment will be governed by the following provisions.]

(2) Before any proposals for program discontinuance on grounds of financial exigency are made, the faculty or an appropriate faculty body will have opportunity to render an assessment in writing of the institution's financial condition.

[Note: Academic programs cannot be defined ad hoc, at any size; programs should be recognized academic units that existed prior to the declaration of financial exigency. The term "program" should designate a related cluster of credit-bearing courses that constitute a coherent body of study within a discipline or set of related disciplines. When feasible, the term should designate a department or similar administrative unit that offers majors and minors.]

(i) The faculty or an appropriate faculty body will have access to at least five years of audited financial statements, current and following-year budgets, and detailed cash-flow estimates for future years.

*Recommended Institutional Regulations on Academic Freedom and Tenure*

(ii) In order to make informed recommendations about the financial impact of program closures, the faculty or an appropriate faculty body will have access to detailed program, department, and administrative-unit budgets.

(iii) Faculty members in a program being considered for discontinuance because of financial exigency will promptly be informed of this activity in writing and provided at least thirty days in which to respond to it. Tenured, tenure-track, and contingent faculty members will be informed and invited to respond.

(3) If the administration issues notice to a particular faculty member of an intention to terminate the appointment because of financial exigency, the faculty member will have the right to a full hearing before a faculty committee. The hearing need not conform in all respects with a proceeding conducted pursuant to Regulation 5, but the essentials of an on-the-record adjudicative hearing will be observed. The issues in this hearing may include the following:

(i) The existence and extent of the condition of financial exigency. The burden will rest on the administration to prove the existence and extent of the condition. The findings of a faculty committee in a previous proceeding involving the same issue may be introduced.

(ii) The validity of the educational judgments and the criteria for identification for termination; but the recommendations of a faculty body on these matters will be considered presumptively valid.

(iii) Whether the criteria are being properly applied in the individual case.

(4) If the institution, because of financial exigency, terminates appointments, it will not at the same time make new appointments, except in extraordinary circumstances where a serious distortion in the academic program would otherwise result. The appointment of a faculty member with tenure will not be terminated in favor of retaining a faculty member without tenure,

except in extraordinary circumstances where a serious distortion of the academic program would otherwise result.

(5) Before terminating an appointment because of financial exigency, the institution, with faculty participation, will make every effort to place the faculty member concerned in another suitable position within the institution.

(6) In all cases of termination of appointment because of financial exigency, the faculty member concerned will be given notice or severance salary not less than as prescribed in Regulation 8.

(7) In all cases of termination of appointment because of financial exigency, the place of the faculty member concerned will not be filled by a replacement within a period of three years, unless the released faculty member has been offered reinstatement and at least thirty days in which to accept or decline it.

## Discontinuance of Program or Department for Educational Reasons[8]

d. Termination of an appointment with continuous tenure, or of a probationary or other nontenured appointment before the end of the specified term, may occur as a result of bona fide formal discontinuance of a program or department of instruction. The following standards and procedures will apply.

(1) The decision to discontinue formally a program or department of instruction will be based essentially upon educational considerations, as determined primarily by the faculty as a whole or an appropriate committee thereof.

[Note: "Educational considerations" do not include cyclical or temporary variations in enrollment. They must reflect long-range judgments that the educational mission of the institution as a whole will be enhanced by the discontinuance.]

(2) Faculty members in a program being considered for discontinuance for educational considerations will promptly be informed of this activity in writing and provided at

least thirty days in which to respond to it. Tenured, tenure-track, and contingent faculty members will be invited to participate in these deliberations.

[Note: Academic programs cannot be defined ad hoc, at any size; programs must be recognized academic units that existed prior to the decision to discontinue them. The term "program" should designate a related cluster of credit-bearing courses that constitute a coherent body of study within a discipline or set of related disciplines. When feasible, the term should designate a department or similar administrative unit that offers majors and minors.]

(3) Before the administration issues notice to a faculty member of its intention to terminate an appointment because of formal discontinuance of a program or department of instruction, the institution will make every effort to place the faculty member concerned in another suitable position. If placement in another position would be facilitated by a reasonable period of training, financial and other support for such training will be proffered. If no position is available within the institution, with or without retraining, the faculty member's appointment then may be terminated, but only with provision for severance salary equitably adjusted to the faculty member's length of past and potential service, an amount which may well exceed but not be less than the amount prescribed in Regulation 8.

[Note: When an institution proposes to discontinue a program or department of instruction based essentially on educational considerations, it should plan to bear the costs of relocating, training, or otherwise compensating faculty members adversely affected.]

(4) A faculty member who contests a proposed relocation or termination resulting from a discontinuance has a right to a full hearing before a faculty committee. The hearing need not conform in all respects with a proceeding conducted pursuant to Regulation 5, but the essentials of an on-the-record adjudicative hearing will be observed. The issues in such a hearing may include the institution's failure to satisfy any of the conditions specified in Regulation 4d. In the hearing, a faculty determination that a program or department is to be discontinued will be considered presumptively valid, but the burden of proof on other issues will rest on the administration.

**Review**

e. In cases of termination of appointment, the governing board will be available for ultimate review.

## 5. DISMISSAL PROCEDURES

a. Adequate cause for a dismissal will be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers. Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights of American citizens.[9]

b. Dismissal of a faculty member with continuous tenure, or with a probationary or other nontenured appointment before the end of the specified term, will be preceded by (1) discussions between the faculty member and appropriate administrative officers looking toward a mutual settlement; (2) informal inquiry by the duly elected faculty committee [insert name of committee], which may, if it fails to effect an adjustment, determine whether in its opinion dismissal proceedings should be undertaken, without its opinion being binding upon the president; (3) a statement of charges, framed with reasonable particularity by the president or the president's delegate.

c. A dismissal, as defined in Regulation 5a, will be preceded by a statement of charges, and the individual concerned will have the right to be heard initially by the elected faculty hearing committee [insert name of committee].[10] Members deeming themselves disqualified for bias or interest will remove themselves from the case, either at the request of a party or on their own initiative. Each party will have a maximum of two challenges without stated cause.[11]

(1) Pending a final decision by the hearing committee, the faculty member will be suspended, or assigned to other duties in lieu of suspension, only if immediate harm

*Recommended Institutional Regulations on Academic Freedom and Tenure*

to the faculty member or others is threatened by continuance. Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures, the administration will consult with the Faculty Committee on Academic Freedom and Tenure [or whatever other title it may have] concerning the propriety, the length, and the other conditions of the suspension. A suspension that is intended to be final is a dismissal and will be treated as such. Salary will continue during the period of the suspension.

(2) The hearing committee may, with the consent of the parties concerned, hold joint prehearing meetings with the parties in order to (i) simplify the issues, (ii) effect stipulations of facts, (iii) provide for the exchange of documentary or other information, and (iv) achieve such other appropriate prehearing objectives as will make the hearing fair, effective, and expeditious.

(3) Service of notice of hearing with specific charges in writing will be made at least twenty days prior to the hearing. The faculty member may waive a hearing or may respond to the charges in writing at any time before the hearing. If the faculty member waives a hearing, but denies the charges or asserts that the charges do not support a finding of adequate cause, the hearing tribunal will evaluate all available evidence and rest its recommendation upon the evidence in the record.

(4) The committee, in consultation with the president and the faculty member, will exercise its judgment as to whether the hearing should be public or private.

(5) During the proceedings the faculty member will be permitted to have an academic adviser and counsel of the faculty member's choice.

(6) At the request of either party or the hearing committee, a representative of a responsible educational association will be permitted to attend the proceedings as an observer.

(7) A verbatim record of the hearing or hearings will be taken, and a copy will be made available to the faculty member without cost, at the faculty member's request.

(8) The burden of proof that adequate cause exists rests with the institution and will be satisfied only by clear and convincing evidence in the record considered as a whole.

(9) The hearing committee will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made.

(10) The faculty member will be afforded an opportunity to obtain necessary witnesses and documentary or other evidence. The administration will cooperate with the hearing committee in securing witnesses and in making available documentary and other evidence.

(11) The faculty member and the administration will have the right to confront and cross-examine all witnesses. Where the witnesses cannot or will not appear, but the committee determines that the interests of justice require admission of their statements, the committee will identify the witnesses, disclose their statements, and, if possible, provide for interrogatories.

(12) In the hearing of charges of incompetence, the testimony will include that of qualified faculty members from this or other institutions of higher education.

(13) The hearing committee will not be bound by strict rules of legal evidence and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available.

(14) The findings of fact and the decision will be based solely on the hearing record.

(15) Except for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements and publicity about the case by either the faculty member or administrative officers will be avoided so far as possible until the proceedings have been

completed, including consideration by the governing board of the institution. The president and the faculty member will be notified of the decision in writing and will be given a copy of the record of the hearing.

(16) If the hearing committee concludes that adequate cause for dismissal has not been established by the evidence in the record, it will so report to the president. If the president rejects the report, the president will state the reasons for doing so, in writing, to the hearing committee and to the faculty member and provide an opportunity for response before transmitting the case to the governing board. If the hearing committee concludes that adequate cause for a dismissal has been established, but that an academic penalty less than dismissal would be more appropriate, it will so recommend, with supporting reasons.

## 6. Action by the Governing Board

If dismissal or other severe sanction is recommended, the president will, on request of the faculty member, transmit to the governing board the record of the case. The governing board's review will be based on the record of the committee hearing, and it will provide opportunity for argument, oral or written or both, by the principals at the hearing or by their representatives. The decision of the hearing committee will either be sustained or the proceedings returned to the committee with specific objections. The committee will then reconsider, taking into account the stated objections and receiving new evidence, if necessary. The governing board will make a final decision only after study of the committee's reconsideration.

## 7. Procedures for Imposition of Sanctions Other Than Dismissal

a. If the administration believes that the conduct of a faculty member, although not constituting adequate cause for dismissal, is sufficiently grave to justify imposition of a severe sanction, such as suspension from service for a stated period, the administration may institute a proceeding to impose such a severe sanction; the procedures outlined in Regulation 5 will govern such a proceeding.

b. If the administration believes that the conduct of a faculty member justifies imposition of a minor sanction, such as a reprimand, it will notify the faculty member of the basis of the proposed sanction and provide the faculty member with an opportunity to persuade the administration that the proposed sanction should not be imposed. A faculty member who believes that a major sanction has been incorrectly imposed under this paragraph, or that a minor sanction has been unjustly imposed, may, pursuant to Regulation 16, petition the faculty grievance committee for such action as may be appropriate.

## 8. Terminal Salary or Notice

If the appointment is terminated, the faculty member will receive salary or notice in accordance with the following schedule: at least three months, if the final decision is reached by March 1 (or three months prior to the expiration) of the first year of probationary service; at least six months, if the decision is reached by December 15 of the second year (or after nine months but prior to eighteen months) of probationary service; at least one year, if the decision is reached after eighteen months of probationary service or if the faculty member has tenure.[12]

This provision for terminal notice or salary need not apply in the event that there has been a finding that the conduct which justified dismissal involved moral turpitude. On the recommendation of the faculty hearing committee or the president, the governing board, in determining what, if any, payments will be made beyond the effective date of dismissal, may take into account the length and quality of service of the faculty member.

## 9. Academic Freedom and Protection against Discrimination

a. All members of the faculty, whether tenured or not, are entitled to academic freedom as set forth in the 1940 *Statement of Principles on Academic Freedom and Tenure,* formulated by the Association of American Colleges and Universities and the American Association of University Professors.

b. All members of the faculty, whether tenured or not, are entitled to protection against illegal or unconstitutional discrimination by the institution, or discrimination on a basis not demonstrably related to the faculty member's

*Recommended Institutional Regulations on Academic Freedom and Tenure*

professional performance, including but not limited to race, sex, religion, national origin, age, disability, marital status, or sexual orientation.

## 10. COMPLAINTS OF VIOLATION OF ACADEMIC FREEDOM OR OF DISCRIMINATION IN NONREAPPOINTMENT

If a faculty member on probationary or other non-tenured appointment alleges that a decision against reappointment was based significantly on considerations that violate (a) academic freedom or (b) governing policies on making appointments without prejudice with respect to race, sex, religion, national origin, age, disability, marital status, or sexual orientation, the allegation will be given preliminary consideration by the [insert name of committee], which will seek to settle the matter by informal methods. The allegation will be accompanied by a statement that the faculty member agrees to the presentation, for the consideration of the faculty committee, of such reasons and evidence as the institution may allege in support of its decision. If the difficulty is unresolved at this stage and if the committee so recommends, the matter will be heard in the manner set forth in Regulations 5 and 6, except that the faculty member making the complaint is responsible for stating the grounds upon which the allegations are based and the burden of proof will rest upon the faculty member. If the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision against reappointment to come forward with evidence in support of their decision. Statistical evidence of improper discrimination may be used in establishing a prima facie case.

## 11. ADMINISTRATIVE PERSONNEL

The foregoing regulations apply to administrative personnel who hold academic rank, but only in their capacity as faculty members. Administrators who allege that a consideration that violates academic freedom or governing policies against improper discrimination, as stated in Regulation 10, significantly contributed to a decision to terminate their appointment to an administrative post or not to reappoint them are entitled to the procedures set forth in Regulation 10.

## 12. POLITICAL ACTIVITIES OF FACULTY MEMBERS

Faculty members, as citizens, are free to engage in political activities. Where necessary, leaves of absence may be given for the duration of an election campaign or a term of office, on timely application, and for a reasonable period of time. The terms of such leave of absence will be set forth in writing, and the leave will not affect unfavorably the tenure status of a faculty member, except that time spent on such leave will not count as probationary service unless otherwise agreed to.[13]

## 13. PART-TIME FACULTY APPOINTMENTS[14]

a. After having been reappointed beyond an initial term, a part-time faculty member who is subsequently notified of nonreappointment will be advised upon request of the reasons that contributed to the decision. Upon the faculty member's further request, the reasons will be confirmed in writing. The faculty member will be afforded opportunity for review of the decision by a faculty committee.

b. For part-time faculty members who have served for three or more terms within a span of three years, the following additional protections of academic due process apply:

(1) Written notice of reappointment or non-reappointment will be issued no later than one month before the end of the existing appointment. If the notice of reappointment is to be conditioned, for example, on sufficiency of student enrollment or on financial considerations, the specific conditions will be stated with the issuance of the notice.

(2) When the part-time faculty member is denied reappointment to an available assignment (one with substantially identical responsibilities assigned to another part-time faculty member with less service), if the nonreappointed faculty member alleges that the decision was based on inadequate consideration, the allegation will be subject to review by a faculty body. If this body, while not providing judgment on the merits of the decision, finds that the consideration has been inadequate in any substantial respects, it will remand the matter for further consideration accordingly.[15]

c. Prior to consideration of reappointment beyond a seventh year, part-time faculty members who have taught at least twelve courses or six terms

*Recommended Institutional Regulations on Academic Freedom and Tenure*

within those seven years shall be provided a comprehensive review with the potential result of (1) appointment with part-time tenure [where such exists], (2) appointment with part-time continuing service, or (3) nonreappointment. Those appointed with tenure shall be afforded the same procedural safeguards as full-time tenured faculty. Those offered additional appointment without tenure shall have continuing appointments and shall not be replaced by part-time appointees with less service who are assigned substantially identical responsibilities without having been afforded the procedural safeguards associated with dismissal as set forth in Regulation 5.

### 14. GRADUATE STUDENT EMPLOYEES

a. The length, terms, and conditions of every university appointment of a graduate student employee will be stated in writing at the time of the initial appointment. A copy of the appointment document will be supplied to the appointee.[16]

b. The graduate student employee on recurring appointments will be advised at the time of initial appointment of the substantive standards, expectations, and procedures generally employed at the institution in decisions affecting renewal and of any special standards adopted by the graduate student employee's department or school. The graduate student employee will be advised of the time when decisions affecting renewals are made and will be given the opportunity to submit material believed to be helpful to an adequate consideration of his or her circumstances.

c. In a case of dismissal before the end of the period of an academic or professional appointment, the graduate student employee will be provided with a statement of reasons for the action and will have the right to a pretermination hearing before a duly constituted committee. The hearing need not conform in all respects with a proceeding conducted pursuant to Regulation 5, but the essentials of an on-the-record adjudicative hearing will be observed. In such a hearing, the administration will have the burden of showing adequate cause for dismissal.[17] Adequate cause for a dismissal will be related, directly and substantially, to the fitness of the graduate student employee in his or her professional capacity

regarding teaching, research, or other academic duties. Dismissal will not be used to restrain graduate student employees in their exercise of academic freedom or constitutional rights.

d. Written notice of reappointment or nonreappointment will be issued to graduate student academic or professional employees no later than one month before the end of the existing appointment.

e. Graduate student academic or professional employees who are notified of nonreappointment will be advised upon request of the reasons that contributed to the decision. Upon the employee's further request, the reasons will be confirmed in writing. The employee will be afforded the opportunity for review of the decision by a duly constituted committee.

f. In a case of nonreappointment, if a graduate student academic or professional employee establishes a prima facie case to the satisfaction of a duly constituted committee that considerations that violate academic freedom or governing policies against improper discrimination based on race, sex, national origin, age, disability, marital status, or sexual orientation significantly contributed to his or her nonretention, it is incumbent on those who made the decision to come forward with evidence in support of that decision.

g. If a graduate student employee who is denied reappointment to an available academic or professional position alleges that the decision was based on inadequate consideration, the allegation will be subject to review by a duly constituted body.[18] If this body, while not providing judgment on the merits of the decision, finds that the consideration has been inadequate in any substantial respects, it will remand the matter, recommending to the department that it assess the merits once again, this time remedying the inadequacies of its prior consideration.[19]

h. Graduate student academic or professional employees will have access to the faculty grievance committee, as specified in Regulation 16.

### 15. OTHER ACADEMIC STAFF

a. In no case will a member of the academic staff who is not otherwise protected by the preceding

*Recommended Institutional Regulations on Academic Freedom and Tenure*

regulations that relate to dismissal proceedings be dismissed without having been provided with a statement of reasons and an opportunity to be heard before a duly constituted committee.[20] (A dismissal is a termination before the end of the period of appointment.)

b. With respect to the nonreappointment of a member of such academic staff who establishes a prima facie case to the satisfaction of a duly constituted committee that considerations that violate academic freedom, or of governing policies against improper discrimination as stated in Regulation 10, significantly contributed to the nonreappointment, the academic staff member will be given a statement of reasons by those responsible for the nonreappointment and an opportunity to be heard by the committee.

## 16. GRIEVANCE PROCEDURE

If any faculty member alleges cause for grievance in any matter not covered by the procedures described in the foregoing regulations, the faculty member may petition the elected faculty grievance committee [here name the committee] for redress. The petition will set forth in detail the nature of the grievance and will state against whom the grievance is directed. It will contain any factual or other data that the petitioner deems pertinent to the case. Statistical evidence of improper discrimination, including discrimination in salary, may be used in establishing a prima facie case. The committee will decide whether or not the facts merit a detailed investigation; if the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision to come forward with evidence in support of their decision. Submission of a petition will not automatically entail investigation or detailed consideration thereof. The committee may seek to bring about a settlement of the issue(s) satisfactory to the parties. If in the opinion of the committee such a settlement is not possible or is not appropriate, the committee will report its findings and recommendations to the petitioner and to the appropriate administrative officer and faculty body, and the petitioner will, upon request, be provided an opportunity to present the grievance to them. The grievance committee will consist of three [or some other number] elected members of the faculty. No officer of the administration will serve on the committee.

## Note on Implementation

The *Recommended Institutional Regulations* here presented will require for their implementation a number of structural arrangements and agencies. For example, the *Regulations* will need support by

1. channels of communication among all the involved components of the institution and between them and a concerned faculty member;

2. definitions of corporate and individual faculty status within the college or university government and of the role of the faculty in decisions relating to academic freedom and tenure; and

3. appropriate procedures for the creation and operation of faculty committees, with particular regard to the principles of faculty authority and responsibility.

The forms which these supporting elements assume will of course vary from one institution to another. Consequently, no detailed description of the elements is attempted in the *Recommended Institutional Regulations*. With respect to the principles involved, guidance will be found in the Association's *Statement on Government of Colleges and Universities*. ▪

## NOTES

1. Under the 1940 *Statement of Principles on Academic Freedom and Tenure*, this period may not exceed seven years. However, the Association's 2001 *Statement of Principles on Family Responsibilities and Academic Work* (AAUP, *Policy Documents and Reports*, 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 339–46) provides that "a faculty member is entitled to stop the clock or extend the probationary period, with or without taking a full or partial leave of absence, if the faculty member (whether male or female) is a primary coequal caregiver of newborn or newly adopted children" and that "institutions allow the tenure clock to be stopped for up to one year for each child, and . . . that faculty be allowed to stop the clock only twice, resulting in no more than two one-year extensions of the probationary period."

2. The exception here noted applies only to an institution where the maximum probationary period exceeds four years.

3. April 15 is the recommended date.

4. This committee, which can be the grievance committee noted in Regulation 16, is to be an elected faculty body. Similarly, the members of the committees noted in Regulations 4c(3), 4d(4), 10, and 13 are to be elected. A committee of faculty members appointed by an elected faculty body can substitute for a committee that is elected directly.

5. See *The Role of the Faculty in Conditions of Financial Exigency,*

in *Policy Documents and Reports*, 292–308. The definition of "financial exigency" offered in that report and adopted here is intended to be more responsive to actual institutional conditions and extends the standard of exigency to situations not covered by Committee A's previous definition.

6. See *The Role of the Faculty in Budgetary and Salary Matters*, in *Policy Documents and Reports*, 289–91, especially the following passages:

> The faculty should participate both in the preparation of the total institutional budget and (within the framework of the total budget) in decisions relevant to the further apportioning of its specific fiscal divisions (salaries, academic programs, tuition, physical plant and grounds, and so on). The soundness of resulting decisions should be enhanced if an elected representative committee of the faculty participates in deciding on the overall allocation of institutional resources and the proportion to be devoted directly to the academic program. This committee should be given access to all information that it requires to perform its task effectively, and it should have the opportunity to confer periodically with representatives of the administration and governing board. . . .
>
> Circumstances of financial exigency obviously pose special problems. At institutions experiencing major threats to their continued financial support, the faculty should be informed as early and specifically as possible of significant impending financial difficulties. The faculty—with substantial representation from its nontenured as well as its tenured members, since it is the former who are likely to bear the brunt of the reduction—should participate at the department, college or professional school, and institution-wide levels in key decisions as to the future of the institution and of specific academic programs within the institution. The faculty, employing accepted standards of due process, should assume primary responsibility for determining the status of individual faculty members.

7. See *Statement on Government of Colleges and Universities*, in *Policy Documents and Reports*, 117–22, especially the following passage: "Faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal. The primary responsibility of the faculty for such matters is based upon the fact that its judgment is central to general educational policy."

8. When discontinuance of a program or department is mandated by financial exigency of the institution, the standards of Regulation 4c, above, will apply.

9. For cause relating to physical or mental disability, see *Accommodating Faculty Members Who Have Disabilities*, in *Policy Documents and Reports*, 374–78.

10. This committee should not be the same as the committee referred to in Regulation 5b(2).

11. Regulations of the institution should provide for alternates or for some other method of filling vacancies on the hearing committee resulting from disqualification, challenge without stated cause, illness, resignation, or other reason.

12. For renewable term appointments not specifically designated

as probationary for tenure, see "The Applicability of the 'Standards for Notice of Nonreappointment' to All Full-Time Faculty on Renewable Term Appointments," in "Report of Committee A, 1994–95" (*Academe*, September–October 1995, 51–54), which states:

> While academic institutions commonly adhere to the Association's *Standards for Notice of Nonreappointment* with respect to faculty appointments that they recognize as probationary, in many cases they have not considered those standards to be applicable to those full-time faculty members whose service under non-tenure-track appointments has involved more than "a brief association with the institution" and who continue to serve on annual appointments that are indefinitely renewable at the discretion of the administration. Typically, although the terms of their appointments may stipulate that they are for one year only, the faculty members are given reason to expect that, so long as they perform creditably and so long as enough courses remain available, the appointments will be renewed. Frequently, however, at or near the end of an academic year, these individuals are suddenly notified that their appointments are not in fact being renewed for the following year. Despite what may have been an extended affiliation with the institution, the faculty members are not viewed as entitled to the notice of nonreappointment that would be given to colleagues who hold appointments designated as probationary.
>
> Committee A considers all full-time faculty members holding renewable term appointments, whatever their title or status, to be entitled to notice of nonreappointment as called for in the Association's recommended standards. We do not view it as necessary, or indeed as equitable, to deprive full-time "non-tenure-track" faculty members of the safeguards that the standards for notice are intended to provide.

13. See *Statement on Professors and Political Activity*, in *Policy Documents and Reports*, 39.

14. There should be no invidious distinctions between those who teach and/or conduct research in higher education, regardless of whether they hold full-time or part-time appointments or whether their appointments are tenured, tenure-track, or contingent. All faculty members should have access to the same due-process protections and procedures; Regulations 1–10, 12, and 16 therefore apply to all faculty members. The reality however, is that distinctions do exist in the academy. For that reason, Regulation 13 contains recommended provisions that apply only to part-time faculty appointments. This regulation does not apply to faculty members with reduced loads who are probationary for tenure and who have the protections of academic due process that are provided in Regulation 2. It does apply to all other faculty members whose appointments are less than full time, regardless of rank or title and of whether they are paid on a pro-rata, per-course, or any other basis.

15. See *Statement on Procedural Standards in the Renewal or Non-renewal of Faculty Appointments*, in *Policy Documents and Reports*, 94–98, especially the following passages:

> It is easier to state what the standard "adequate consideration" does not mean than to specify in detail what it does. It does not mean that

*Recommended Institutional Regulations on Academic Freedom and Tenure*

the review committee should substitute its own judgment for that of members of the department on the merits of whether the candidate should be reappointed or given tenure. The conscientious judgment of the candidate's departmental colleagues must prevail if the invaluable tradition of departmental autonomy in professional judgments is to prevail. The term "adequate consideration" refers essentially to procedural rather than to substantive issues: Was the decision conscientiously arrived at? Was all available evidence bearing on the relevant performance of the candidate sought out and considered? Was there adequate deliberation by the department over the import of the evidence in the light of the relevant standards? Were irrelevant and improper standards excluded from consideration? Was the decision a bona fide exercise of professional academic judgment? These are the kinds of questions suggested by the standard "adequate consideration."

If, in applying this standard, the review committee concludes that adequate consideration was not given, its appropriate response should be to recommend to the department that it assess the merits once again, this time remedying the inadequacies of its prior consideration.

16. Universities assume responsibilities when they accept graduate students with a promise of financial support. Graduate student employees have a legitimate expectation of fulfillment of the promise unless legitimate cause to terminate support is shown. If the cause relates to the graduate student employee's work and/or academic performance or progress, the employee should be given sufficient time and opportunity to address the concern.

17. According to the Association's *Statement on Collective Bargaining* (*Policy Documents and Reports*, 323–24), "Participation in a strike or other work action does not by itself constitute grounds for dismissal or nonreappointment or for imposing other sanctions against faculty members."

18. For comment on the term *adequate consideration*, see note 15, above.

19. Nonreappointment conditioned on inadequate academic performance as a graduate student may be reviewed in the manner provided in Committee A's statement *The Assignment of Course Grades and Student Appeals*, in *Policy Documents and Reports*, 29–30.

20. Each institution should define with particularity who are members of the academic staff.

# Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments

The statement that follows, a revision of a statement originally adopted in 1971, was approved by the Association's Committee A on Academic Freedom and Tenure, adopted by the Association's Council in November 1989, and endorsed by the Seventy-Sixth Annual Meeting.

Except for special appointments clearly designated at the outset as involving only a brief association with the institution, all full-time faculty appointments are either with continuous tenure or probationary for tenure. Procedures bearing on the renewal or nonrenewal of probationary appointments are this statement's concern.

## The Probationary Period: Standards and Criteria

The 1940 *Statement of Principles on Academic Freedom and Tenure* prescribes that "during the probationary period a teacher should have the academic freedom that all other members of the faculty have." The Association's *Recommended Institutional Regulations on Academic Freedom and Tenure*[1] prescribe further that "all members of the faculty, whether tenured or not, are entitled to protection against illegal or unconstitutional discrimination by the institution, or discrimination on a basis not demonstrably related to the faculty member's professional performance. . . ." A number of the rights of nontenured faculty members provide support for their academic freedom and protection against improper discrimination. They cannot, for example, be dismissed before the end of a term appointment except for adequate cause that has been demonstrated through academic due process—a right they share with tenured members of the faculty. If they assert that they have been given notice of nonreappointment in violation of academic freedom or because of improper discrimination, they are entitled to an opportunity to establish their claim in accordance with Regulation 10 of the *Recommended Institutional Regulations.* They are entitled to timely notice of nonreappointment in accordance with the schedule prescribed in the statement on *Standards for Notice of Nonreappointment.*[2] Lacking the reinforcement of tenure, however, academic freedom and protection against improper

discrimination for probationary faculty members have depended primarily upon the understanding and support of their tenured colleagues, the administration, and professional organizations, especially the American Association of University Professors. In the *Statement on Government of Colleges and Universities,* the Association has asserted that "faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal." Collegial deliberation of the kind envisioned by the *Statement on Government* will minimize the risk of a violation of academic freedom, of improper discrimination, and of a decision that is arbitrary or based on inadequate consideration.

Frequently, young faculty members have had no training or experience in teaching, and their first major research endeavor may still be uncompleted at the time they start their careers as college teachers. Under these circumstances, it is particularly important that there be a probationary period—a maximum of seven years under the 1940 *Statement of Principles on Academic Freedom and Tenure*—before tenure is granted. Such a period gives probationary faculty members time to prove themselves, and their colleagues time to observe and evaluate them on the basis of their performance in the position rather than on the basis only of their education, training, and recommendations.

Good practice requires that the institution (department, college, or university) define its criteria for reappointment and tenure and its procedures for reaching decisions on these matters. The 1940 *Statement of Principles* prescribes that "the precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated."

94

Moreover, fairness to probationary faculty members prescribes that they be informed, early in their appointments, of the substantive and procedural standards that will be followed in determining whether or not their appointments will be renewed or tenure will be granted.

The Association accordingly recommends:

1. *Criteria and Notice of Standards*
Probationary faculty members should be advised, early in their appointment, of the substantive and procedural standards generally accepted in decisions affecting renewal and tenure. Any special standards adopted by their particular departments or schools should also be brought to their attention.

**The Probationary Period:**
**Evaluation and Decision**
The relationship of the senior and junior faculty should be one of colleagueship, even though nontenured faculty members know that in time they will be judged by their senior colleagues. Thus the procedures adopted for evaluation and possible notification of nonrenewal should not endanger this relationship where it exists, and should encourage it where it does not. Nontenured faculty members should have available to them the advice and assistance of their senior colleagues; and the ability of senior colleagues to make a sound decision on renewal or tenure will be enhanced if an opportunity is provided for a regular review of the candidate's qualifications. A conjunction of the roles in counseling and evaluation may be productive: for example, an evaluation, whether interim or at the time of final determination of renewal or tenure, should be presented in such a manner as to assist nontenured faculty members as they strive to improve their performance.

Any recommendation regarding renewal or tenure should be reached by an appropriate faculty group in accordance with procedures approved by the faculty. Because it is important to both the faculty member and the decision-making body that all significant information be considered, the candidate should be notified that a decision is to be made regarding renewal of appointment or the granting of tenure and should be afforded an opportunity to submit material that the candidate believes to be relevant to the decision.

The Association accordingly recommends:

2. a. *Periodic Review*
There should be provision for periodic review of a faculty member's situation during the probationary service.

b. *Opportunity to Submit Material*
Probationary faculty members should be advised of the time when decisions affecting renewal and tenure are ordinarily made, and they should be given the opportunity to submit material that they believe will be helpful to an adequate consideration of their circumstances.

Observance of the practices and procedures outlined above should minimize the likelihood of reasonable complaint if nontenured faculty members are given notice of nonreappointment. They will have been informed of the criteria and procedures for renewal and tenure; they will have been counseled by faculty colleagues; they will have been given an opportunity to have all material relevant to their evaluation considered; and they will have a timely decision representing the views of faculty colleagues.

**Notice of Reasons**
Since 1971 it has been the Association's position, reached after careful examination of advantages and disadvantages, that nontenured faculty members notified of nonreappointment should, upon request, receive a statement of the reasons for the decision. In reaching this position, the Association considered the needs both of the institution and of the individual faculty member.

A major responsibility of the institution is to recruit and retain the best-qualified faculty within its goals and means. In a matter of such fundamental importance, the institution, through the appropriate faculty agencies, must be accorded the widest latitude consistent with academic freedom, equal opportunity, and the standards of fairness. The Association recognized that the requirement of giving reasons could lead, however erroneously, to an expectation that the decision-making body must justify its decision. A notice of nonreappointment could thus become confused with dismissal for cause, and under these circumstances the decision-making body could become reluctant to reach adverse decisions that might culminate in grievance procedures. As a result there was some risk that the important distinction between tenure and probation would be eroded.

Weighed against these important institutional concerns, however, were the interests of the individual faculty members. They could be honestly unaware of the reasons for a negative decision, and the decision could be based on a judgment of shortcomings which they could easily remedy if informed of them. A decision not to renew an appointment could be based on erroneous information which the faculty member could

95

readily correct if informed of the basis for the decision. Again, the decision could be based on considerations of institutional policy or program development that have nothing to do with the faculty member's professional competence, and if not informed of the reasons, the faculty member could mistakenly assume that a judgment of inadequate performance has been made. In the face of a persistent refusal to supply the reasons, a faculty member may be more inclined to attribute improper motivations to the decision-making body or to conclude that its evaluation has been based upon inadequate consideration. If the faculty member wished to request a reconsideration of the decision, or a review by another body, ignorance of the reasons for the decision would create difficulties both in reaching a decision whether to initiate such a request and in presenting a case for reconsideration or review.

The Association's extensive experience with specific cases since 1971 has confirmed its conclusion that the reasons in support of the faculty member's right to be informed outweigh the countervailing risks. Every notice of nonreappointment, however, need not be accompanied by a written statement of the reasons for nonreappointment. It may not always be to the advantage of the faculty member to be informed of the reasons for nonreappointment, particularly in writing. The faculty member may be placed under obligation to divulge them to the appointing body of another institution if it inquired. Similarly, a written record is likely to become the basis for continuing responses by the faculty member's former institution to prospective appointing bodies.

At many institutions, moreover, the procedures of evaluation and decision may make it difficult, if not impossible, to compile a statement of reasons that precisely reflects the basis of the decision. When a number of faculty members participate in the decision, they may oppose a reappointment for a variety of reasons, few or none of which may represent a majority view. To include every reason, no matter how few have held it, in a written statement to the faculty member may misrepresent the general view and damage unnecessarily both the morale and the professional future of the faculty member.

In many situations, of course, a decision not to reappoint will not reflect adversely upon the faculty member. An institution may, for example, find it necessary for financial or other reasons to restrict its offerings in a given department. The acquisition of tenure may depend not only upon satisfactory performance but also upon a long-term opening. Nonrenewal in these cases does not suggest a serious adverse judgment. In these situations, providing a statement of reasons, either written or oral, should pose no difficulty, and such a statement may in fact assist the faculty member in searching for a new position.

Should the faculty member, after weighing the considerations cited above, decide to request the reasons for the decision against reappointment, the reasons should be given. The faculty member also should have the opportunity to request a reconsideration by the decision-making body.

The Association accordingly recommends:

3. *Notice of Reasons*
   In the event of a decision not to renew an appointment, the faculty member should be informed of the decision in writing, and, upon request, be advised of the reasons which contributed to that decision. The faculty member should also have the opportunity to request a reconsideration by the body or individual that made the decision.

## Written Reasons

Having been given orally the reasons that contributed to the decision against reappointment, the faculty member, to avoid misunderstanding, may request that they be confirmed in writing. The faculty member may wish to petition the appropriate faculty committee, in accordance with Regulation 10 of the Association's *Recommended Institutional Regulations*, to consider an allegation that the reasons given, or other reasons that were not stated, constitute a violation of academic freedom or improper discrimination. The faculty member may wish to petition a committee, in accordance with Regulation 16 of the *Recommended Institutional Regulations*, to consider a complaint that the decision resulted from inadequate consideration and was therefore unfair. The faculty member may believe that a written statement of reasons might be useful in pursuing a professional career.

If the department chair or other appropriate institutional officer to whom the request is made believes that confirming the oral statement in writing may be damaging to the faculty member on grounds such as those cited earlier in this statement, it would be desirable for that officer to explain the possible adverse consequences of confirming the oral statement in writing. If, in spite of this explanation, the faculty member continues to request a written statement, the request should be honored.

The Association accordingly recommends:

4. *Written Reasons*
   If the faculty member expresses a desire to petition the grievance committee (such as is

described in Regulations 10 and 16 of the Association's *Recommended Institutional Regulations*), or any other appropriate committee, to use its good offices of inquiry, recommendation, and report, or if the request is made for any other reason satisfactory to the faculty member alone, the reasons given in explanation of the nonrenewal should be confirmed in writing.

## Review Procedures: Allegations of Violation of Academic Freedom or of Discrimination

The best safeguard against a proliferation of grievance petitions on a given campus is the observance of sound principles and procedures of academic freedom and tenure and of institutional government. Observance of the procedures recommended in this statement—procedures that would provide guidance to nontenured faculty members, help assure them of a fair professional evaluation, and enlighten them concerning the reasons contributing to key decisions of their colleagues—should contribute to the achievement of harmonious faculty relationships and the development of well-qualified faculties.

Even with the best practices and procedures, however, faculty members will at times think that they have been improperly or unjustly treated and may wish another faculty group to review a decision of the faculty body immediately involved. The Association believes that fairness to both the individual and the institution requires that the institution provide for such a review when it is requested. The possibility of a violation of academic freedom or of improper discrimination is of vital concern to the institution as a whole, and where either is alleged it is of cardinal importance to the faculty and the administration to determine whether substantial grounds for the allegation exist. The institution should also be concerned to see that decisions respecting reappointment are based upon adequate consideration, and provision should thus be made for a review of allegations by affected faculty members that the consideration has been inadequate.

Because of the broader significance of a violation of academic freedom or of improper discrimination, the Association believes that the procedures to be followed in these two kinds of complaints should be kept separate from a complaint over adequacy of consideration. Regulation 10 of the *Recommended Institutional Regulations* provides a specific procedure for the review of complaints of academic freedom violation or of discrimination:[3]

If a faculty member on probationary or other nontenured appointment alleges that a decision against reappointment was based significantly on considerations that violate (1) academic freedom or (2) governing policies on making appointments without prejudice with respect to race, sex, religion, national origin, age, disability, marital status, or sexual orientation, the allegation will be given preliminary consideration by the [insert name of committee], which will seek to settle the matter by informal methods. The allegation will be accompanied by a statement that the faculty member agrees to the presentation, for the consideration of the faculty committee, of such reasons and evidence as the institution may allege in support of its decision. If the difficulty is unresolved at this stage, and if the committee so recommends, the matter will be heard in the manner set forth in Regulations 5 and 6, except that the faculty member making the complaint is responsible for stating the grounds upon which the allegations are based, and the burden of proof will rest upon the faculty member. If the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision against reappointment to come forward with evidence in support of their decision. Statistical evidence of improper discrimination may be used in establishing a prima facie case.

The Association accordingly recommends:

5. *Petition for Review Alleging an Academic Freedom Violation or Improper Discrimination* Insofar as the petition for review alleges a violation of academic freedom or improper discrimination, the functions of the committee that reviews the faculty member's petition should be the following:
   a. to determine whether or not the notice of nonreappointment constitutes on its face a violation of academic freedom or improper discrimination;
   b. to seek to settle the matter by informal methods;
   c. if the matter remains unresolved, to decide whether or not the evidence submitted in support of the petition warrants a recommendation that a formal proceeding be conducted in accordance with Regulations 5 and 6 of the *Recommended Institutional Regulations,* with the burden of proof resting upon the complaining faculty member.

## Review Procedures: Allegations of Inadequate Consideration

Complaints of inadequate consideration are likely to relate to matters of professional judgment,

where the department or departmental agency should have primary authority. For this reason, the basic functions of the review committee should be to determine whether the appropriate faculty body gave adequate consideration to the faculty member's candidacy in reaching its decision and, if the review committee determines otherwise, to request reconsideration by that body.

It is easier to state what the standard "adequate consideration" does not mean than to specify in detail what it does. It does not mean that the review committee should substitute its own judgment for that of members of the department on the merits of whether the candidate should be reappointed or given tenure.[4] The conscientious judgment of the candidate's departmental colleagues must prevail if the invaluable tradition of departmental autonomy in professional judgments is to prevail. The term "adequate consideration" refers essentially to procedural rather than to substantive issues: Was the decision conscientiously arrived at? Was all available evidence bearing on the relevant performance of the candidate sought out and considered? Was there adequate deliberation by the department over the import of the evidence in light of the relevant standards? Were irrelevant and improper standards excluded from consideration? Was the decision a bona fide exercise of professional academic judgment? These are the kinds of questions suggested by the standard "adequate consideration."

If, in applying this standard, the review committee concludes that adequate consideration was not given, its appropriate response should be to recommend to the department that it assess the merits once again, this time remedying the inadequacies of its prior consideration.

An acceptable review procedure, representing one procedural system within which such judgments may be made, is outlined in Regulation 16 of the *Recommended Institutional Regulations*, as follows:

> If any faculty member alleges cause for grievance in any matter not covered by the procedures described in the foregoing regulations, the faculty member may petition the elected faculty grievance committee [here name the committee] for redress. The petition will set forth in detail the nature of the grievance and will state against whom the grievance is directed. It will contain any factual or other data which the petitioner deems pertinent to the case. Statistical evidence of improper discrimination, including discrimination in salary, may be used in establishing a prima facie case. The committee will decide whether or not the facts merit a detailed investigation; if the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision to come forward with evidence in support of their decision. Submission of a petition will not automatically entail investigation or detailed consideration thereof. The committee may seek to bring about a settlement of the issue satisfactory to the parties. If in the opinion of the committee such a settlement is not possible or is not appropriate, the committee will report its findings and recommendations to the petitioner and to the appropriate administrative officer and faculty body, and the petitioner will, upon request, be provided an opportunity to present the grievance to them. The grievance committee will consist of three [or some other number] elected members of the faculty. No officer of administration will serve on the committee.

The Association accordingly recommends:

6. *Petition for Review Alleging Inadequate Consideration*
Insofar as the petition for review alleges inadequate consideration, the functions of the committee which reviews the faculty member's petition should be the following:
   a. to determine whether the decision was the result of adequate consideration, with the understanding that the review committee should not substitute its judgment on the merits for that of the body or individual that made the decision;
   b. to request reconsideration by the faculty body when the committee believes that adequate consideration was not given to the faculty member's qualifications (in such instances, the committee should indicate the respects in which it believes that consideration may have been inadequate); and
   c. to provide copies of its report and recommendation to the faculty member, the body or individual that made the decision, and the president or other appropriate administrative officer.

**Notes**
1. AAUP, *Policy Documents and Reports*, 11th ed. (Baltimore: Johns Hopkins University Press, 2015), 85.
2. Ibid., 99.
3. Faculties processing complaints under Regulations 10 and 16 may wish to secure the further advice of the Association's Washington office.
4. As used here, "department" may refer to any institutional body or individual responsible for making a recommendation or decision on reappointment.

## **VERIFICATION**

I, K. Jeff Carney, M.D., Pharm D., after being sworn, upon personal knowledge, state that the facts set forth in my Complaint in the within action are true and correct.

K. Jeff Carney, M.D., PharmD.

Sworn to and subscribed before me this \_\_\_ day of July, 2021.

Notary Public